# EXHIBIT B

```
1              IN THE UNITED STATES DISTRICT COURT
2             FOR THE SOUTHERN DISTRICT OF OHIO
3                     WESTERN DIVISION
4
5     ----------------------------------------
                                             :
6     HARRY ARMSTRONG,                       :
                                             :
7              Plaintiff,                    :
                                             :
8         vs.                                :     CASE NO.
                                             :     C-1-01-817
9     CINCINNATI BELL TELEPHONE,             :
                                             :
10             Defendant.                    :
                                             :
11    ----------------------------------------
12
13
14        DEPOSITION OF:      HARRY J. ARMSTRONG, II
15        TAKEN:              By the Defendant
                              Pursuant to Agreement
16        DATE:               July 14, 2003
17        TIME:               Commencing at 9:30 a.m.
18        PLACE:              Offices of Frost Brown Todd
                              2200 PNC Center
19                            201 East 5th Street
                              Cincinnati, Ohio  45202
20
          BEFORE:             Nancy A. Burns
21                            Notary Public - State of Ohio
22
23
24                                        ORIGINAL
25
```

1          Q.    At installation and repair.

2          A.    Installing telephones, jacks, wires, inside or

3     outside, or trouble-shooting in repair.

4          Q.    Okay.

5          A.    To find out what the cause of the phone problem

6     was.

7          Q.    Okay.  At some point did that job description

8     change?

9          A.    Yes.

10         Q.    When was that?

11         A.    I think it was in '95 or '96.

12         Q.    Okay.

13         A.    Might have been before that but it was about

14    that period of time.

15         Q.    Okay.  And what changed?

16         A.    Well, they combined, they, they combined I&R,

17    which is installation and repair, with splicing.

18         Q.    Okay.

19         A.    And they called it universal technician.  So we

20    had to do everything from the central office all the way out

21    to the premises, all the way out through the premises and

22    everything in between.

23         Q.    Okay.  Help me understand the difference

24    between installation and repair and splicing.

25         A.    Splicing is a little more difficult than

1    installation and repair.  Splicing deals primarily with

2    cable maintenance or supplying line from the switching

3    office, which is called the central office, or CO, to the

4    customer's premises.

5         Q.    Okay.

6         A.    Splicing generally stopped at the customer's

7    basement or the entrance of a cable into their house.  I&R

8    took it from that point on up through the premises and made

9    sure the customer had the phone service they desired.

10         Q.    Okay.  So around 1995 or 1996 you're saying

11    that your job, the I&R function was combined you're saying

12    with splicing and the new job description was you were a

13    universal tech?

14         A.    Correct.

15         Q.    Is that correct? And as a universal tech you

16    were responsible for both the installation, repair and the

17    splicing, whatever the need was, on a day-to-day basis, is

18    that correct?

19         A.    That's correct.

20         Q.    How did that work, Mr. Armstrong?  When you

21    came to work each day as a universal tech did your immediate

22    supervisor divy out the jobs as to here are the orders,

23    here's what needs to be done today?

24         A.    Yes.  At one period of time they would give us

25    a stack of printing or paper to work, work on paper, then it

```
 1          Q.    Okay.

 2          A.    Nobody called him William.

 3          Q.    Okay.  And that's your signature at the bottom,

 4    too, that's a little bit cut off on this copy, correct?

 5          A.    Yes.

 6          Q.    So this evaluation was reviewed with you?

 7          A.    Yes.

 8          Q.    And you were satisfied with the evaluation?

 9          A.    Never satisfied with an average but I guess I

10    didn't have any fight with it, no.

11          Q.    Okay.  I note also on the second page it notes

12    that you need to work on your attendance, correct?

13          A.    Where did you say?

14          Q.    On the second page of that evaluation at the

15    very bottom under Comments.

16          A.    Yes, yes, correct.

17          Q.    Over the years attendance was an issue for you,

18    was it not?

19          A.    I guess, I believe it was.

20                (Defendant's Exhibit 9 was marked for

21                identification.)

22          Q.    Showing you what's been marked Defendant's

23    Exhibit 9, take a look at these, see if you agree with me

24    this is a series of warnings to you about your attendance.

25                MR. DEARDORFF:   Just for the record on the
```

```
 1          Q.    And this was reviewed with you?
 2          A.    I believe, yes, I believe so, yes.
 3          Q.    And were you satisfied with this performance
 4   appraisal?
 5          A.    No.  Once again, I'm never satisfied with it.
 6          Q.    What do you mean when you say you weren't
 7   satisfied?
 8          A.    If it's not outstanding, which I don't know
 9   that I have any, at least above average, then I'm not
10   satisfied with it.
11          Q.    Not satisfied because you felt you could have
12   done better?
13          A.    Perhaps.
14          Q.    Is there anything about this performance
15   appraisal that you felt was not fair?
16          A.    I think my personal relationships were better
17   than average but other than that overall I think it's on
18   point.
19                (Defendant's Exhibit 11 was marked for
20                identification.)
21          Q.    Recognize this document?
22          A.    Yes.
23          Q.    And what is it?
24          A.    It's a performance appraisal.
25          Q.    For you, correct?
```

1     A.    For me, correct.

2     Q.    It's a 12-month appraisal, correct?

3     A.    Correct.

4     Q.    The date at the bottom is January 1994,

5  correct?

6     A.    Correct.

7     Q.    So this is the evaluation for your, the job

8  that you performed in 1993, correct?

9     A.    Correct.

10     Q.    And your job at the time was services

11  technician, correct?

12     A.    That's correct.

13     Q.    And you were indicating, I mean you were

14  receiving maximum wages, correct?

15     A.    Correct.

16     Q.    And it indicates an overall rating, looks like

17  it wasn't checked but it says total points 270, correct?

18     A.    That's correct.

19     Q.    And if you look over where that puts you that

20  would have put you in the above average category, it just

21  wasn't checked, correct?

22     A.    Correct.

23     Q.    And it was signed by your supervisor, Charles

24  Thrasher, correct?

25     A.    Correct.

1    Q.    And it was reviewed with you?

2    A.    Yes.

3    Q.    And you were satisfied that it was a fair

4    evaluation?

5    A.    I think so.

6          (Defendant's Exhibit 12 was marked for

7          identification.)

8    Q.    Do you recognize this document?

9    A.    Yes.

10   Q.    It's a performance evaluation for you, correct?

11   A.    Correct.

12   Q.    Twelve-month appraisal that's dated at the

13   bottom January 1995, correct?

14   A.    Correct.

15   Q.    So it's an evaluation for the year 1994,

16   correct?

17   A.    Yes.

18   Q.    Indicates you were a splicer, correct?

19   A.    Yes.

20   Q.    Earning maximum wages, correct?

21   A.    Yes.

22   Q.    To make sure I'm understanding what you said

23   before, if it indicates you were a splicer that was then at

24   that point you had gone to this universal tech position,

25   would that be correct?

1        A.     Yes, yes, that's correct, '95, yes.

2        Q.     Okay.  And you received an above average

3    performance rating overall, correct?

4        A.     Yes.

5        Q.     And your supervisor who issued this evaluation

6    and signed it was Charles Thrasher, correct?

7        A.     Yes.

8        Q.     And this was reviewed with you?

9        A.     Yes.

10        Q.     And you were satisfied that it was a fair

11    evaluation?

12        A.     Yes.

13               (Defendant's Exhibit 13 was marked for

14               identification.)

15        Q.     Mr. Armstrong, I'd ask you to take a look at

16    Defendant's Exhibit 15 and tell me if you recognize it.  I'm

17    not sure that it's a document you necessarily would have

18    seen. Do you recognize this document?

19        A.     I won't say that I don't but I don't recall,

20    no, no, I don't recognize it.

21        Q.     You'd agree with me that it indicates at the

22    top that it's a repair update, correct?

23        A.     Yeah.  I don't know if that's, I think this is

24    an indicator of some training that I had on meters and how

25    I, how I did, performed with that training.

1          Q.    It says, He took an average amount of time --

2          A.    With the tone arc.

3          Q.    What is the tone arc?

4          A.    All of these are, trouble busters you're going

5    to come to, also, all of these instruments are used for

6    locating trouble in telephone cable.

7          Q.    But trouble buster?

8          A.    Right.

9          Q.    Says you took an average amount of time with

10   tone arc but struggled with trouble buster.

11         A.    Mm-hmm.

12         Q.    Allowed him to take a fourth day to do extra

13   practice with the trouble buster, correct?

14         A.    Correct.

15         Q.    And by the end of the day Harry seemed to have

16   a decent idea of how the equipment worked, correct?

17         A.    Correct.

18         Q.    So this was training that you were receiving on

19   equipment that you needed to use for your job as a splicer,

20   is that correct?

21         A.    Do a more efficient job, right.

22         Q.    Do you recall receiving training like this?

23         A.    Yes.

24         Q.    And over the course of your history with

25   Cincinnati Bell I assume you received training off and on on

```
 1    a regular basis, correct?
 2         A.    That's correct.
 3         Q.    Okay.  And this would seem to indicate that you
 4    had been given some extra time in order to master the
 5    trouble buster, correct?
 6         A.    Yes.
 7               (Defendant's Exhibit 14 was marked for
 8               identification.)
 9         Q.    By now you probably know what I'm going to
10    ask, which is first do you recognize this document?
11         A.    Appraisal, performance appraisal.
12         Q.    And performance appraisal for you for a
13    12-month period, correct?
14         A.    Correct.
15         Q.    And it indicates that your job at that point
16    was splicer, correct?
17         A.    That's correct.
18         Q.    You were being paid current wage at maximum,
19    correct?
20         A.    Correct.
21         Q.    And it's dated at the bottom that it was issued
22    by Ken Boatright, or signed by Ken Boatright, on January 26,
23    1998, correct?
24         A.    Correct.
25         Q.    So it's an appraisal for the 1997 year,
```

1    correct?

2          A.    Correct.

3          Q.    And it indicates an overall performance of

4    above average, correct?

5          A.    Correct.

6          Q.    And you were satisfied that this was a fair

7    evaluation from Mr. Boatright?

8          A.    I think he was always fair for the most part.

9          Q.    So you were satisfied that it was a fair

10   evaluation?

11         A.    Yes.

12               (Defendant's Exhibit 15 was marked for

13               identification.)

14         Q.    Look at Defendant's Exhibit 15 and tell me if

15   you recognize this.

16         A.    It's an performance appraisal for myself.

17         Q.    Okay.  And it's a 12-month appraisal that was

18   issued in December of 1998, correct?

19         A.    Correct.

20         Q.    Since it was issued in December of 1998 it

21   would appear to be an evaluation for 1998, correct?

22         A.    Correct.

23         Q.    And it indicates that you were a splicer,

24   correct?

25         A.    That's correct.

1    Q.    Receiving wages at maximum, correct?

2    A.    Correct.

3    Q.    And you received an overall performance rating

4    of average, correct?

5    A.    Yes.

6    Q.    And it was issued and signed by Ken Boatright,

7    correct?

8    A.    Yes.

9    Q.    And you signed it, correct?

10    A.    Yes.

11    Q.    And you were satisfied that this was a fair

12    evaluation?

13    A.    Yes.

14    Q.    Okay.

15    (There was a brief recess and Defendant's Exhibit 16 was

16    marked for identification.)

17    Q.    I think you've got in front of you what's

18    marked Defendant's Exhibit 16.  Just take a moment to look

19    that over and I'll ask you to identify it for us.

20    A.    It's a performance appraisal for myself, I had

21    maximum pay for the year 1999, I believe, supervisor Ken

22    Boatright.

23    Q.    That's correct.  And your title it indicates

24    was splicer, correct?

25    A.    Yes.

```
 1          Q.    And you received an average rating, is that
 2     correct?
 3          A.    Yes.
 4          Q.    And it was issued and signed by your supervisor
 5     Ken Boatright, correct?
 6          A.    Yes.
 7          Q.    And you were satisfied that this was a fair
 8     evaluation?
 9          A.    Yes.
10                (Defendant's Exhibit 17 was marked for
11                identification.)
12          Q.    Mr. Armstrong, please take all the time you
13     need to look this over.
14          A.    Okay.
15          Q.    Do you recognize this document?
16          A.    Yes.
17          Q.    And what is it?
18          A.    It's a performance development plan.
19          Q.    Okay.  And it actually looks to me like it may
20     have been stapled together out of order.  Would you agree
21     with me that the first page said Attachment A Performance
22     Development Planning Worksheet?
23          A.    Yes.
24          Q.    And then what is currently the last page the
25     way it's been stapled together says Attachment B.
```

1     A.     Correct.

2     Q.     Individual 12-week performance improvement

3    plan.  And then the second and third pages, because this is

4    a four-page document, says Attachment C at the top,

5    Individual Performance Development Plan Notification, is

6    that correct?

7     A.     Right, that's correct.

8     Q.     If we look at the second page, the individual

9    performance development plan notification indicates a date

10   at the bottom of May 15th, 2000, is that correct?

11    A.     Yes.

12    Q.     So you were informed on May 15th, 2000 that you

13   were being placed on a performance development plan, is that

14   correct?

15    A.     Yes.

16    Q.     Do you recall that?

17    A.     Yes.

18    Q.     And it indicates that, here on the second page,

19   that you have failed to meet the minimum requirements for

20   the productivity and/or quality team goals for three

21   consecutive pay periods, is that correct?

22    A.     That's what it says.

23    Q.     And it indicates in the middle of the page that

24   if you fail to meet your minimum goals at the end of the

25   performance improvement evaluation period you may be

1    considered for reassignment or possible dismissal, correct?

2         A.    That's what it says, correct.

3         Q.    And this was reviewed with you on May 15, 2000,

4    correct?

5         A.    Yes.  I also asked to be reassigned and was

6    denied.

7         Q.    You asked to be reassigned to another position,

8    correct?

9         A.    Yes, I did.  Several times.

10        Q.    If we look at the first page, Attachment A, the

11   actual worksheet, was this the worksheet that, is this Mr.

12   Boatright's handwriting, do you know?

13        A.    I think it is, I think he's the one that done

14   the evaluation, I'm not sure.  I believe it is.

15        Q.    Well, he signed it on the second page?

16        A.    Yes, right.

17        Q.    And the first page of the worksheet, was this

18   the worksheet he went over with you to explain what it was

19   you needed to work on?

20        A.    Yes, I think so, yes, I believe he did.  He was

21   pretty thorough.

22        Q.    And it indicates for performance objective,

23   Create higher level of confidence to handle the unexpected

24   better.  Did I read that correctly?

25        A.    Yes, you did.

1      Q.    And under Development opportunity it indicates

2  that some training is necessary including a training video

3  on self discipline, is that correct?

4      A.    Yes.

5      Q.    He talked to you about having you watch a

6  training video on self discipline?

7      A.    Yes, he did.

8      Q.    And under Action Items it indicates among other

9  things that you need to learn to be cool in crisis, correct?

10      A.    Yes.

11      Q.    And under Results it says to be better equipped

12  to take action quickly and handle the problems with a clear

13  perspective, correct?

14      A.    Yes.

15      Q.    So Mr. Boatright went over all of this with

16  you?

17      A.    Yes.

18      Q.    And it indicates a completion date of August 6,

19  2000, correct?

20      A.    Yes.

21      Q.    So you understood, you understood in May of

22  2000 that Mr. Boatright felt you needed to learn to be cool

23  in a crisis and learn better self discipline, correct?

24      A.    Yes.  I don't remember what that was referring

25  to. It could be anything that people -- We all sometimes

1    are, have our moments of disagreement with another worker or

2    whoever, or could be our supervisor, I don't know.

3         Q.    But you understood these were the goals he was

4    setting out for you?

5         A.    Right.

6         Q.    And you understood that if you didn't meet

7    these goals that it was possible that you could be

8    dismissed, correct?

9         A.    That's what it says.

10        Q.    Okay.

11        A.    There's one more thing with this performance

12   plan that, when they first came out with it and everyone

13   passed, they raised the bar, and it was admitted that it was

14   designed so that a certain number would fail, so they had to

15   raise the bar in order to meet that objective.  We all knew

16   that, so I think this was after they adjusted that.

17        Q.    Mr. Armstrong, I'd just ask you to answer my

18   questions and we can get through this sometime today.

19              (Defendant's Exhibit 18 was marked for

20              identification.)

21        Q.    Take a look at Defendant's Exhibit 18, please.

22        A.    Okay.

23        Q.    Do you recognize this document?

24        A.    Yes.

25        Q.    And what is it?

```
 1          A.     It's another performance development plan.
 2          Q.     Okay.  And it indicates on the second page that
 3    it was issued to you on October 3rd, 2000, correct?
 4          A.     Correct.
 5          Q.     And that's your signature that appears there,
 6    correct?
 7          A.     That's correct.
 8          Q.     And it looks like it was issued, again, by Ken
 9    Boatright, correct?
10          A.     Yes.
11          Q.     And it indicates again on the second page that
12    you had failed to meet the minimum requirements for
13    productivity and quality, correct?
14          A.     Where does it say that?
15          Q.     At the top.  This is to notify Harry Armstrong
16    that you have failed to meet the minimum requirements for
17    the productivity or quality team goals.
18          A.     Right.
19          Q.     And it indicates, again, just like the other
20    one did, in the middle of the page that if you fail to meet
21    your minimum goals you may be considered for, among other
22    things, dismissal, correct, it says for reassignment or
23    dismissal?
24          A.     Yes, yes.
25          Q.     Okay.  If we look at the first page would you
```

1    agree with me, Mr. Armstrong, that the first page here, the

2    worksheet, that sets out what you need to work on is almost

3    identical to the earlier performance improvement plan that

4    we looked at in terms of what it says you need to work on?

5         A.    Yes.

6         Q.    It again lists that you need to work on

7    handling the unexpected better, correct?

8         A.    Yes.

9         Q.    It says that you need to, again, go through

10   training on self discipline only this time Mr. Boatright has

11   put in parenthesis next to that Emotional control, correct?

12        A.    Yes.

13        Q.    It indicates that you need to be better

14   equipped to handle the unknown and be cool and calm in a

15   crisis, correct?

16        A.    Yes.

17        Q.    And once again it says be better equipped to

18   take action quick and handle the problems with a clear

19   perspective, correct?

20        A.    Yes.

21        Q.    And Mr. Boatright reviewed this with you,

22   correct?

23        A.    Yes.

24        Q.    You had difficulty with your emotional control

25   and self discipline?

1          A.      That's what it says.

2          Q.      And you were on notice by the company that it

3     felt you had that difficulty, correct?

4          A.      Yes.

5          Q.      Okay.  Mr. Armstrong, what I'd like to do now

6     is I'd like for you to walk me through November 8th, 2000.

7     Let's start at the beginning of the day when you arrived at

8     work.  You arrived at work that day and what jobs did you

9     work on that day, do you recall?

10          A.      I don't remember the initial starting but at

11     some point, I think towards noon or maybe just before noon,

12     I was coupled up with another worker, that was Paul Bouldin,

13     who I had just met and I believe he had maybe two or three

14     years with the company, if that long, I'm not sure.

15          Q.      And on this particular day at this point, just

16     to make sure the record is clear, you were working in the

17     North Side garage, is that correct?

18          A.      Working out of the North Side garage.

19          Q.      Out of the North Side garage?

20          A.      Yes.

21          Q.      And you were a universal tech, correct?

22          A.      Yes.  That's what they said.

23          Q.      And at this point who was your immediate

24     supervisor?

25          A.      Tim Day.  No.  Yeah, Tim Day.

1      A.    Six to eight feet, right.

2      Q.    When he came in the door he was sitting at the

3   other send of the table about six feet away.  I'm sorry, go

4   ahead.

5      A.    I approached, so from the north if I'm headed

6   towards, if I'm facing the south of the table at the other

7   end John would have been on the, he would have been on the

8   left --

9      Q.    Okay.

10     A.    -- side of the table.

11           MR. DEARDORFF:  That would be he's coming from

12       the north going south?

13     A.    And I came in and sat down where, at the head

14   of the table here.

15     Q.    Okay.

16     A.    North.

17           MR. DEARDORFF:  North.

18     A.    Northern most part of the table.  And I plugged

19   in to access the field system with my unit.

20     Q.    Okay.

21     A.    And had my paperwork.

22     Q.    I'm sorry.  Go ahead.

23     A.    This conversation was already going on about

24   the elections and something to the effect about why we

25   didn't have a president yet.

1    pertained to me.

2        Q.    Who do you recall was talking?

3        A.    John, Ray and Lawrence, I don't recall Paul or,

4    the two Pauls, Bouldin or Field, I don't recall any comments

5    from him.

6        Q.    Okay.  What I need for you to do, Mr.

7    Armstrong, is tell me as best you can recall what you recall

8    of the conversation, who said what, what was said.

9        A.    I don't recall exactly what was said as far as

10   the election controversy itself.  The things that stands out

11   in my mind was, you know, after several attempts to what

12   someone might say get a word in edgewise and being edged out

13   by John's behavior or his raising his voice as though I

14   didn't count, didn't matter, or wasn't there, I recall him

15   looking at me directly and swiping his hand in a claw hand

16   across his body.  He's still half sitting across the table,

17   putting his unit down, and takes his hand and looking at me

18   directly and saying, You're irrelevant.  That's why I lost

19   my temper.  And I stood up and I lost the ball cap and the

20   coat, which I'm sure you're going to ask about, I told him,

21   Don't ever tell me that I'm irrelevant, and, I will, and I

22   used language that I'm not proud of, and then he said that

23   he didn't say I was irrelevant, he said that what I was

24   talking about was irrelevant, at which point I do recall

25   telling him that, You know, I think I can hold my own in

1    what was the gesture, help me understand.

2         A.    I'm trying to do it so Nancy can print it.  It

3    was, looked like claw hands and swiped from one side of his

4    body.  He's half sitting on the table, I don't know how

5    you're going to get this in the record now, and he swipes,

6    he swipes and he looks at me and says, You're irrelevant.

7         Q.    So it was a gesture that he made with his hand?

8         A.    And a sneer on his face and --

9         Q.    When he said according to you you're irrelevant

10   it was a gesture he made while he was saying you're

11   irrelevant?

12        A.    Right.

13        Q.    It was not a gesture towards you, it was sort

14   of a gesture across his body, is that right?

15        A.    When you say towards me, it was meant for me, I

16   know that.

17        Q.    Was it a fist?

18        A.    No, it wasn't a fist, it was like claw hand,

19   you know, indicating you're irrelevant.  I don't know how to

20   explain it.

21        Q.    And then you said that you lost your ball cap

22   and coat.  You threw off your ball cap and coat when you

23   lost your temper?

24        A.    I did, yes.

25        Q.    And you stood up?

1          A.     Yes.  I was signing my time sheet at that time.

2          Q.     And did you move towards him?

3          A.     I came, I was here and I came to this side of

4     the table and I stopped about right here, and he's sitting

5     on that side of the table.  Of course the table is not as

6     wide as this one, okay?  But he's still on the other side of

7     the table.

8          Q.     How wide would you say the table was, according

9     to you?

10          A.     I don't know, maybe three feet across and one's

11     maybe about four feet across, I'm not sure.

12          Q.     So you jumped up, you threw your ball --

13          A.     I stood up.

14          Q.     You stood up, you threw your coat and your hat

15     off and you moved down the table towards him so that you

16     were standing across the table, directly across the table

17     from him?

18          A.     No, I wasn't directly across, there was still

19     an angle, I mean he's like she was and I'm here, because

20     Lawrence Cotton got up behind me and somebody said he held

21     me.  He didn't hold me, he never restrained me, but he was

22     patting me on the shoulder saying, Harry, calm down, calm

23     down, calm down.

24          Q.     So Lawrence got up from where he was sitting

25     and followed you?

1    A.    Well, yeah, a foot or two, couple feet.

2    Q.    And you say you used language you weren't proud

3    of.  I need for you to tell me in as much detail as you can

4    recall what exactly you said.

5    A.    I don't recall all of that and, you know, I'm

6    not going, I'm not going to repeat that language.

7    Q.    Mr. Armstrong, I've got to disagree with you

8    there.

9    A.    I'm not going to repeat that language.

10    Q.    That language is an issue in this case and

11    you're under oath.

12    A.    Well, I'm sure you have records of all of that

13    or you have witness statements, you know.  I made those

14    statements and I made them at a moment when I was upset,

15    that I don't normally use, and I'm not going to use it.  I'm

16    not upset now.  If you want to upset me perhaps I will, you

17    know.  I'm not going to use that language again because I'm

18    not proud of it.

19    Q.    What words did you say to Mr. Walker?

20    A.    I'm not going to say.

21    Q.    I'm going to have to insist that you answer

22    this question.

23    A.    You can insist but -- I don't remember

24    everything I said.  It wasn't good.

25    MR. DEARDORFF:  She has a right to ask you the

1        question, Harry.  I know you don't want to say it

2        because of the foulness of the language but she has

3        the right to judge --

4        A.    Whatever I said, I don't remember all the words

5   but I'm ashamed that I used any of them, apart from the

6   company issue and the job issue I'm ashamed that I used any

7   of it and I don't remember any of it I said.

8        Q.    Mr. Armstrong, I understand you're ashamed.

9   You filed a lawsuit and you've got to answer the question.

10  What did you say to Mr. Walker?

11       A.    Don't you have witness statements? I think they

12  could say.  I don't remember exactly what I said.  There's

13  some things that can be cloudy in your memory, some things

14  that can be traumatized to, that's not clear, and I can sit

15  here and give you something that I think I might have said

16  but it might not necessarily be true.

17       Q.    Did you tell Mr. Walker that you were going to

18  kick his mother fucking ass all over the parking lot?

19       A.    I believe I did.  I don't know about all over

20  the parking lot.

21       Q.    You did tell him you were going to kick his

22  mother fucking ass?

23       A.    I said if he wanted to continue to disrespect

24  me I would, if he wanted to continue to disrespect me I

25  would.

```
 1          Q.    And you said that more than once, did you not?

 2          A.    I may have.

 3          Q.    Do you recall anything else that you said?

 4          A.    I don't recall anything apart from that

 5    directly that I said but whatever I said I know it wasn't

 6    good.

 7          Q.    I'll ask you again.  I need for you to tell me

 8    everything that you recall that you said.

 9          A.    Everything that I recall that I said I don't

10    recall other than you're refreshing my memory with that last

11    statement, but, I don't know, some people have pinpoint

12    memories, you know, they can remember everything.  I'm not

13    one of them.  And it's gotten worse during this interim time

14    since that situation, and I feel like it's getting worse all

15    the time, I've told Tim.

16          MR. DEARDORFF:  I'll just enter that the

17          question's been asked and answered.

18          Q.    So it's your testimony that other than telling

19    him you were going to kick his mother fucking ass you used

20    some profanity but you --

21          A.    You can start saying some things but I don't

22    remember exactly what I said to him.  I do recall saying

23    that, something along those lines.  Just like I don't

24    remember what the conversation about the political issues

25    were, I don't recall exactly what that was.  I know it was
```

1    you recall?

2        A.    He admitted that he brought this on hisself,

3    you know, I told him, you know, he's talking down to me ever

4    since I've known him, I didn't feel, and I told him, You

5    brought this on yourself.

6        Q.    What happened next, Mr. Armstrong, according to

7    you?

8        A.    We're at the point where Lawrence was standing

9    next to me and patted me on my shoulder and saying, Harry,

10   calm down.  Then I said, I sat down where I was, went back

11   to my seat.  Johnny and Ray, I guess they finished doing

12   their FASing, I don't know if they finished or just

13   unplugged but they left together.  After they left I, I told

14   Paul Bouldin and Lawrence Cotton, I think Paul Field had, I

15   think he left and headed for his truck.  I told the two of

16   them that, you know, I told them that I'm sorry for what

17   they had to witness and experience, you know, I said, This

18   has been such a wonderful day, it's a shame that it ended

19   this way.  I explained that I was ashamed of my behavior, or

20   my part in it, I told them that I'd been putting up with a

21   lot with Johnny Walker since he came to our crew and he

22   hadn't really been there long enough that he should cause so

23   much trouble so fast, that he was causing problems with

24   other employees, that I didn't have any trouble with him

25   prior to him coming.  And when I finished talking to them I

1    went out, I caught Paul Field before he left, he had got in

2    his van or truck and he was getting ready to drive off.  I

3    stopped him, I told him the same thing, I said, I'm sorry

4    for what you had to witness, I said, I already told the

5    other guys, I said, If I could take it all back I would.  I

6    can't because it's done.  And he said, Sometimes you got to

7    do what you got to do, that's what he said.

8         Q.    At any point in the conversation with Johnny

9    Walker did Johnny Walker tell you that he was going to kick

10   your ass?

11        A.    No, not that I recall.

12              MS. MORGAN:   Let's take a quick break.

13              (Defendant's Exhibit 19 was marked for

14              identification.)

15        Q.    Mr. Armstrong, I'm going to ask you to take a

16   look at Defendant's Exhibit 19.  Take your time to review

17   it.  My first question is going to be whether you recognize

18   it.

19        A.    I do.

20        Q.    And what is it?

21        A.    It's a statement of events that I initiated on

22   that date, November 8th, 2000, and it is addressed to

23   representatives of the CWA 4400 union.

24        Q.    Okay.  And is this an e-mail, is that what this

25   is?

1          A.     Yes.  No, I don't know if it's, doesn't look

2     like it has a complete e-mail address.  Oh, no, that can't

3     go through with all those names on it, it was written up in

4     e-mail form but it wasn't actually sent to them as a letter.

5          Q.     Okay.  I was confused by, are you, where it

6     says From Charms 1022 at webtvnet.  Is that your e-mail

7     address, or was it your e-mail address?

8          A.     Yes.

9          Q.     And at the top where it says Write Message

10    WebTV network, what is that?

11         A.     I don't know.  Write Message, I don't know.  Is

12    the date after it?

13         Q.     Yeah.  The date is Wednesday, December 27th,

14    2000.  Do you know what that date is?  Is that the date you

15    wrote this?

16         A.     I mean if this is in the file anywhere I can go

17    back at any time and pull this up, any date that I choose,

18    to print this out or transmit it, it's going to put that

19    date on it, so the date is always current to the date

20    something is being done as far as printing or transmission.

21         Q.     Do you know, did you send this to the, to the

22    union people indicated here prior to December 27th, 2000?

23    That's possible, isn't it?  Or you tell me.

24         A.     December 27th?

25         Q.     I guess my question is do you know when you

```
 1    sent this?

 2         A.    No, I don't know exactly when I sent it.    I

 3    think it -- Yeah.  Yeah, it could have been prior to that

 4    time, because I could have, where it doesn't show anything

 5    up top as far as dates.

 6         Q.    Let me make sure I understand.  You create

 7    messages like this in your e-mail program?

 8         A.    Right.

 9         Q.    But you don't always send them as e-mail, you

10    sometimes just print them out as if they're letters and mail

11    them and FAX them?

12         A.    Yeah.

13         Q.    Is that typically how you did this?  We're

14    going to look at a lot of these and I guess my question is

15    were they e-mailed?

16         A.    No. Not necessarily.  When I have a name like

17    this, To President Tim Donahue slash V.P. Mel Smith slash

18    Gary, all these different names, each one of those persons

19    -- Normally they don't have groups of people that have one

20    e-mail address all grouped together.

21         Q.    Right.

22         A.    Each one normally have their own address.

23         Q.    Right.

24         A.    So this is just to alert these people that I'm

25    sending this to their attention.
```

```
 1          Q.    Okay.

 2          A.    So they may have gotten this collectively or

 3   individually, I don't know, I don't remember.

 4          Q.    But you do recall writing it?

 5          A.    I do recall writing it.

 6          Q.    And you recall sending it?

 7          A.    I think by mail.  It wouldn't have gone through

 8   like this, I couldn't send it through.

 9          Q.    And that's your signature on the last page?

10          A.    Yes.

11          Q.    And do you recall approximately when you would

12   have sent this, or can you estimate for the record?

13          A.    I think it was sometime in November I believe.

14          Q.    Okay.

15          A.    Late November or early December, I'm not sure.

16   I think a couple even wanted a statement from me.

17          Q.    Okay.

18          A.    As to my recollections of what occurred.

19          Q.    Okay.  And this was to serve as that statement?

20          A.    This was in response to that.

21          Q.    Okay.  So all of the words that are here are

22   your words that you typed in, is that correct?

23          A.    Yes, I believe so.

24          Q.    And I assume that you meant what you wrote here

25   to be a true account in your view as to what happened,
```

1          Q.     That you felt was descriptive of what had gone

2     on on November 8th, correct?

3          A.     Not necessarily because I said in here for lack

4     of a better example.

5          Q.     During the incident on November 8 with Mr.

6     Walker did he at any point make any threats towards you?

7          A.     I will answer again, which I think you asked me

8     that before, I don't recall.

9          Q.     And, Mr. Armstrong, I think I asked you this

10    before.  Just to make sure, this statement that we're

11    looking at here was what you intended to be an accurate

12    description of what went on that day, is that correct?

13         A.     The statement.  You mean this letter?

14         Q.     Yes.

15         A.     Yes.  I think I tried to write accurate, I

16    didn't try to write inaccurate, what I thought using my

17    thoughts.

18         Q.     Other than the talking over you that you've

19    described and the slurs and slang towards women involving

20    hunting that you've described has Mr. Walker ever said

21    anything else to you that you found to be offensive?

22         A.     Well, he exhibited the same behavior before we

23    were coupled on the job, on several jobs.  Not several,

24    about two jobs before.

25         Q.     When you say the same behavior you're referring

```
 1          A.    I don't recall him asking that particular
 2    night, you know, that seems to me like that came later,
 3    maybe much later, but I don't recall it being that night,
 4    no.  I recall him saying there was going to be a full
 5    investigation as to what occurred and for me not to come to
 6    work the next day and that I would hear from someone.  And I
 7    think that may have had to do with medical or supervisor, I
 8    don't know, I don't recall for sure.
 9          Q.    At some point the company asked you for a
10    statement and you provided the statement we've already
11    reviewed, correct?
12          A.    At some point, that's correct.
13          Q.    Okay.  Then after that conversation that night
14    what happened after that?  You received a phone call soon
15    after that from Steve Haaser, is that correct, with Tim
16    Donoghue on the phone?
17          A.    Yes.
18          Q.    Do you recall that?
19          A.    Yes.
20          Q.    And that was in November of 2000, correct?
21          A.    November, late November, early December,
22    something like that, yes.
23          Q.    Okay.  And what do you recall about that
24    conversation?
25          A.    It was a three-way call or three-party call and
```

1    I believe Steve Haaser suggested that I would be, how did he

2    put it, quote, "join the ranks of the retired" on my 50th

3    birthday.

4         Q.    Steve Haaser is a manager, correct?

5         A.    Yes.

6         Q.    And Tim Donoghue was on the phone, he was a

7    union rep?

8         A.    Union president, right.

9         Q.    So Mr. Haaser explained to you that they were

10   going to allow you to stay on disability leave until January

11   2002 at which point you would qualify for retirement

12   benefits, correct?

13        A.    I don't know -- Yeah, something, yes.

14        Q.    Was that your understanding of what the company

15   was doing?

16        A.    At the time I don't really know what I

17   understood because I was more miffed by the fact that Tim

18   didn't say anything.  Okay?  He just more or less, he was on

19   the line.  He did call me back afterwards and, after the

20   conversation was over, but I began to become dissolutioned

21   for what the union's role was.  Then I began to think back

22   on times when I was not established as - Should I stop?

23        Q.    No, please go ahead, sir.

24        A.    When I was not, I was not established as a

25   union member and what role, if any, this was playing into

1    all of this, and I began to feel like, well, this is payback

2    time, so --

3         Q.    I think I misspoke before, Mr. Armstrong, when

4    I said January 2002.  I meant January 2001.  Was your

5    understanding that was in November of 2001?

6         A.    No.  When you say that I know what you're

7    referring to.

8         Q.    Was your understanding they were going to keep

9    you on disability leave until January 2001 at which time

10   you'd be eligible for retirement?

11        A.    My 50 birthday, right, my understanding.

12        Q.    Do you recall whether Mr. Haaser said anything

13   else to you during the telephone conversation about the

14   action the company was taking or do you not remember?

15        A.    At that time it seemed to me, and I may very

16   well be wrong, but it seemed to me that everything was still

17   up in the air because everything I was doing, investigating,

18   I believe my concept was that the union was doing the same

19   and that at some point they were going to take action which

20   --

21        Q.    But Mr. Haaser explained to you, didn't he,

22   that the company could have just terminated your employment

23   but had decided given your years of service to let you stay

24   on disability status until you were eligible for retirement

25   benefits, correct?

1  calls, and then with somebody else and I couldn't get her

2  periodically.

3      Q.    But medical benefits were part of the package

4  that you filled out forms and sent back to the company?

5      A.    Yes.

6      Q.    And you received a lump sum payment in October

7  2002 under the retirement plan, did you not?

8      A.    No.  I was told that I received it in October

9  and I didn't actually get this until I think December.

10      Q.    Okay.  It was a lump sum payment of about

11  $114,000, is that correct?

12      A.    Before or after taxes?  Before taxes, yes.

13      Q.    114,000?

14      A.    Right.

15      Q.    So, Mr. Armstrong, it sounds to me like, tell

16  me if this is correct, like you received the lump sum

17  retirement benefit, you've been working through, from an

18  administrative standpoint, understanding what your medical

19  benefits are, correct?

20      A.    Are you saying that I've been trying to

21  understand what the medical --

22      Q.    Yes.

23      A.    Yes.

24      Q.    Okay.

25          (Defendant's Exhibits 21 & 22 were marked for

```
 1    not making a decision, yes, I made a decision.
 2         Q.    And you didn't follow up with anybody at the
 3    company at any point about the comments or behavior that you
 4    had found at any point to be offensive or threatening,
 5    correct?
 6         A.    Perhaps you're right.  If, if I did not bring
 7    this up to Jan Bending, then again I don't recall if I
 8    talked to her.  I know generally why I was going to her had
 9    reference to these situations, these escalating situations,
10    and if I didn't bring it up to Boatright, no, I didn't bring
11    it up to anybody in company management.
12         Q.    You don't recall specifically bringing it up
13    with Boatright?
14         A.    I don't recall specifically.
15         Q.    You don't recall specifically bringing it up
16    with Jan Bending?
17         A.    No.  And if she says I didn't, then I didn't,
18    you know, I won't argue that.
19                (Defendant's Exhibit 31 was marked for
20                identification.)
21         Q.    Mr. Armstrong, do you recognize Defendant's
22    Exhibit 31?
23         A.    I do.
24         Q.    And what is it?
25         A.    It's an interunion memo between president, Tim
```

```
 1    Donoghue, of Local 4400 from CWA Staff representative,

 2    Henley Johns, dated June 19th, 2001, it's in reference to

 3    myself, Harry Armstrong, Grievance Number 02-12-00 and it's

 4    a statement that they were dismissing my case, this was to I

 5    guess a district level.

 6           Q.    So the union, a grievance was filed on your

 7    behalf over your dismissal, correct?

 8           A.    Correct.

 9           Q.    By the union, correct?

10           A.    Right.

11           Q.    And this letter indicates that after reviewing

12    it the union declined to refer it to arbitration, correct?

13           A.    Right.

14           Q.    And the union states in this letter that they

15    do not, if you look under the second paragraph from the

16    bottom, they do not find this case to be racially motivated

17    as Mr. Armstrong suggests, correct?

18           A.    That's correct.

19           Q.    And they state in the first paragraph that it

20    is their opinion that an arbitrator would rule against the

21    union based on witness statements that Mr. Armstrong did in

22    fact challenge Mr. Walker to go outside and based on

23    language that you were going to kick his blank blank ass

24    more than once, correct?

25           A.    Correct.
```

```
 1          Q.    You appealed this decision, is that correct?
 2          A.    I did.
 3                (Defendant's Exhibit 32 was marked for
 4                identification.)
 5          Q.    Do you recognize Defendant's Exhibit 32?
 6          A.    I do.
 7          Q.    And this is a letter that you wrote and sent to
 8    the union, correct?
 9          A.    Right.
10          Q.    And it is an appeal of the Defendant's Exhibit
11    31 that we just reviewed, is that correct?
12          A.    Yes.
13                (Defendant's Exhibit 33 was marked for
14                identification.)
15          Q.    And that appeal was denied, correct?
16          A.    That's correct.
17          Q.    Do you recognize Defendant's Exhibit 33?
18          A.    I do.
19          Q.    And what is it?
20          A.    I think it's reference to my appeal and
21    dismissal of my case by the, to Tim Donoghue, union
22    president, from Jeff Rechenbach, vice-president at some
23    district level in the union.
24          Q.    And Mr. Rechenbach states in the second
25    paragraph of this letter that he has thoroughly reviewed the
```

1    file and that he does not believe they would prevail in

2    arbitration and is therefore denying the appeal, correct?

3        A.    Yes.

4        Q.    And then in the next paragraph he goes on to

5    say that the behavior you engaged in is clearly prohibited

6    by the company's rules and is the kind of behavior that

7    often leads arbitrators to sustain discharges. Did I read

8    that correctly?

9        A.    Yes, you did.

10       Q.    He also goes on to say at the end of that

11   paragraph that he's reviewed your contentions in your

12   lengthy and numerous documentation and he doesn't find the

13   contentions sufficient to overcome the evidence against you,

14   is that correct?

15       A.    That's correct.

16       Q.    Mr. Armstrong it's fair to say the union didn't

17   think you had a case, correct?

18            MR. DEARDORFF:   Objection.

19       A.    Depends on who you're asking.

20            (Defendant's Exhibit 34 was marked for

21            identification.)

22       Q.    Do you recognize Defendant's Exhibit 34?

23       A.    I do.

24       Q.    And what is it?

25       A.    It's a complaint that I filed against CBT.

1          MS. MORGAN:     We will hold this deposition

2     open.

3          MR. DEARDORFF:  Absolutely.

4          MS. MORGAN:     Because we have not received

5     discovery and we'll be free to explore any further questions

6     we need when we resume.

7          MR. DEARDORFF:  There's no problem with that,

8     that's fine.

9

10    _____

           HARRY J. ARMSTRONG, II

11                    - - -

12         DEPOSITION CONCLUDED AT 5:45 p.m.       SEE NEXT PAGE

13                    - - -

14

15

16

17

18

19

20

21

22

23

24

25

**RULE 30(E) OF THE OHIO RULES OF CIVIL PROCEDURE BEING
INVOKED.** REASON: AFTER HAVING BEEN SUBMITTED FOR
SIGNATURE, TRANSCRIPT WAS NOT SIGNED BY DEPONENT WITHIN
THE ALLOTTED TIME PER RULE30(E).

C E R T I F I C A T E

I, **NANCY A. BURNS**, THE UNDERSIGNED, HAVE SIGNED THE
SIGNATURE OF **HARRY J. ARMSTRONG, II**, TO THE DEPOSITION
PURSUANT TO THE ABOVE-STATED REASON.

NANCY A. BURNS
NOTARY PUBLIC-STATE OF OH

MY COMMISSION EXPIRES:
JULY 20, 2004

```
 1                      C E R T I F I C A T E
 2   STATE OF OHIO        :
 3                        : SS
     COUNTY OF HAMILTON    :
 4             I, Nancy A. Burns, the undersigned, a duly
 5   qualified and commissioned notary public within and for the
 6   State of Ohio, do hereby certify that before the giving of
 7   his aforesaid deposition, HARRY J. ARMSTRONG, II was by me
 8   first duly sworn to depose the truth, the whole truth and
 9   nothing but the truth; that the foregoing is the deposition
10   given at said time and place by HARRY J. ARMSTRONG, II; that
11   said deposition was taken in all respects pursuant to
12   stipulations of counsel hereinbefore set forth; that I am
13   neither a relative of nor employee of any of their counsel,
14   and have no interest whatever in the result of the action.
15             IN WITNESS WHEREOF, I hereunto set my hand and
16   official seal of office at Cincinnati, Ohio, this 23rd day
17   of  September  , 2003.
18
19
20
21
22   My commission expires:      Nancy A. Burns
     July 20, 2004.              Notary Public - State of Ohio
23
24
25
```

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF OHIO
 3                   WESTERN DIVISION
 4      ------------------------------------
                                          :
 5      HARRY ARMSTRONG,                  :
                                          :
 6           Plaintiff,                   :
                                          :
 7        vs.                             :        CASE NO.
                                          :        C-1-01-817
 8      CINCINNATI BELL TELEPHONE,        :
                                          :
 9           Defendant.                   :
                                          :
10      ------------------------------------
11
12                   VOLUME II
13
14      Deposition of:  HARRY ARMSTRONG
15      Taken:          By the Defendant
                        Pursuant to Agreement
16
17      Date:           August 22, 2003
18      Time:           Commencing at 9:52 a.m.
19      Place:          Frost Brown Todd LLC
                        2200 PNC Center
                        201 East Fifth Street
20                      Cincinnati, Ohio  45202
21      Before:         Karen Volk, RPR
                             and
22                      William A. Schupp, CLVS
                        Notaries Public -
23                      State of Ohio
24
25
```

PLEASE INSERT THESE
PAGES IN YOUR ORIGINAL

1    employment with Cincinnati Bell?

2         A.    Not that I'm aware of.

3         Q.    Do you know if you were replaced at

4    Cincinnati Bell?

5         A.    No, I don't.

6              MS. COOK MORGAN:  Go off the record for a

7         moment here.

8              THE VIDEOGRAPHER:  We're off the record at

9         11:20.

10             (Off the record.)

11             (Mr. Seidler left the room and        .

12             Mr. Skidmore entered the room.)

13             THE VIDEOGRAPHER:  We're back on the

14        record at 11:20.

15             MS. COOK MORGAN:  I'm sorry, Karen, could

16        you read back the last question and

17        Mr. Armstrong's answer, if you would?

18             (The record was read.)

19        Q.    Mr. Armstrong, do you believe that

20   Cincinnati Bell has damaged you in any way?

21        A.    Very much.

22        Q.    How do you believe you've been damaged by

23   Cincinnati Bell?

24        A.    The precipitation (sic) of -- from the

25   fallout, the aftermath of what has happened.  I've

1    questions at this time.

2        We've agreed to -- that there are some

3    outstanding discovery issues here.  We've

4    agreed to hold the deposition open in the event

5    it's necessary to address issues once those

6    discovery issues get resolved, okay?

7        MR. DEARDORFF:  All right.  As counsel

8    for Mr. Armstrong, that statement is correct.

9        There are some minor outstanding

10    discovery issues that have to be discussed and

11    there may be some question as to whether the

12    deposition will continue.  If it has to

13    continue, it will either be by agreement, if we

14    can't agree, then we'll consult the magistrate.

15    The appropriate rules.

16        MS. COOK MORGAN:  Thank you.

17        THE VIDEOGRAPHER:  We're off the record at

18    12:16.

19                    _Harry Armstrong_

20                    HARRY ARMSTRONG

21                    - - -                    SEE NEXT PAGE

22        DEPOSITION CONCLUDED AT 12:16 P.M.

23                    - - -

24

25                                        ORIGINAL

**RULE 30(E) OF THE OHIO RULES OF CIVIL PROCEDURE BEING INVOKED.**  REASON:  AFTER HAVING BEEN SUBMITTED FOR SIGNATURE, TRANSCRIPT WAS NOT SIGNED BY DEPONENT WITHIN THE ALLOTTED TIME PER RULE30(E).

## C E R T I F I C A T E

I, **KAREN VOLK**, THE UNDERSIGNED, HAVE SIGNED THE SIGNATURE OF **HARRY ARMSTRONG**, TO THE DEPOSITION PURSUANT TO THE ABOVE-STATED REASON.

_Karen Volk_
_____
KAREN VOLK, RPR
NOTARY PUBLIC-STATE OF OH

MY COMMISSION EXPIRES:
September 17, 2007

```
 1                  C E R T I F I C A T E
 2   STATE OF OHIO        :
                          :        SS
 3   COUNTY OF CLERMONT   :
 4          I, Karen Volk, RPR, the undersigned, a duly
 5   qualified and commissioned notary public within and
 6   for the State of Ohio, do hereby certify that before
 7   the giving of his aforesaid deposition,
 8   HARRY ARMSTRONG was by me first duly sworn to depose
 9   the truth, the whole truth and nothing but the truth;
10   that the foregoing is the deposition given at said
11   time and place by HARRY ARMSTRONG; that said
12   deposition was taken in all respects pursuant to
13   stipulations of counsel; that I am neither a relative
14   of nor employee of any of the parties or their
15   counsel, and have no interest whatever in the result
16   of the action; that I am not, nor is the court
17   reporting firm with which I am affiliated, under a
18   contract as defined in Civil Rule 28(D).
19          IN WITNESS WHEREOF, I hereunto set my hand and
20   official seal of office at Hamilton, Ohio, this
21   day of                   , 2003.
22
23                              _____
                                Karen Volk, RPR
24   My commission expires:     Notary Public - State of Ohio
     September 17, 2007.
25
```

ORIGINAL