# EXHIBIT H

MAUREEN CUSHMAN-LAGERSTROM, Plaintiff-Appellant, v. CITIZENS INSURANCE COMPANY OF AMERICA; ALLMERICA FINANCIAL CORP., Defendants-Appellees.

No. 01-2690

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

2003 U.S. App. LEXIS 15635

July 30, 2003, Filed

**NOTICE:**
**PUB-STATUS:** [*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN. 00-74733. Taylor. 11/27/01.

**DISPOSITION:** Affirmed.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee appealed from the judgment of the District Court (E.D. Mich.) that granted summary judgment to defendants, the employer and its parent company, in the employee's claims of wrongful discharge in violation of public policy and violations of Michigan's Elliott-Larsen Civil Rights Act. Mich. Comp. Laws § 37.2101 et seq.

**OVERVIEW:** The employee was a certified public accountant. At the age of 38, she accepted a position with the parent company to serve as the director of financial operations for its wholly-owned subsidiary, the employer. During her tenure, the employee achieved some noteworthy successes, but also endured a number of strained relationships, particularly with her immediate supervisor. The employers contended that the employee demonstrated a history of ignoring established lines of communication and authority. After the district court granted summary judgment in favor of the employers, the appellate court found that, because the employee was not replaced following her termination, she could not satisfy the fourth prong of the prima facie test for discrimination. The relevant issue was not what percentage of the workforce was eliminated, but rather how much money was saved in the process. Thus, statistical findings did not satisfy the employee's burden, and her age discrimination claim consequently failed. Finally, the supervisor's various disparaging remarks about various female employees were offensive, however, they did not amount to sufficient direct evidence of discrimination.

**OUTCOME:** The judgment was affirmed.

**CORE TERMS:** retaliation, reporting, summary judgment, team, gender discrimination, termination, age discrimination, terminated, replaced, duty, public policy, discharged, prima facie case, direct evidence, violation of public policy, cause of action, non-moving, personnel, decision-maker, eliminated, retaliatory discharge, causal connection, common law, knowledgeable, counterpart, persuasive, workforce, insurer, prong, age discrimination claim

**COUNSEL:** For MAUREEN CUSHMAN-LAGERSTROM, Plaintiff - Appellant: Philip Green, Thomas L. Kent, Green, Green, Adams, Palmer & Craig, Ann Arbor, MI.

For CITIZENS INSURANCE COMPANY OF AMERICA, ALLMERICA FINANCIAL CORP., Defendants - Appellees: Francis R. Ortiz, Rick A. Haberman, Dickinson, Wright, PLLC, Detroit, MI.

**JUDGES:** BEFORE: BATCHELDER and CLAY, Circuit Judges; SCHWARZER, Senior District Judge. *

* The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

**OPINIONBY:** CLAY

**OPINION:** CLAY, Circuit Judge. Plaintiff Maureen Cushman-Lagerstrom appeals from the district court's order, which granted summary judgment to Defendants Citizens Insurance Company [*2] of America ("Citizens") and Allmerica Financial Corp. ("Allmerica") (collectively "Defendants") and dismissed her claims against them. Plaintiff had

Page 1

brought suit alleging, *inter alia.* n1 (1) wrongful discharge in violation of public policy and (2) violations of Michigan's Elliott-Larsen Civil Rights Act. *MICH. COMP. LAWS § 37.2101 et seq.,* to wit, age discrimination, gender discrimination, and retaliation. Plaintiff contends on appeal that summary judgment was inappropriate because genuine issues of material fact remain regarding her claims. For the reasons that follow, we **AFFIRM** the judgment of the district court.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n1 Plaintiff also had brought a fraudulent misrepresentation claim and initially had appealed its dismissal, but she subsequently withdrew the claim at oral argument.

- - - - - - - - - - - End Footnotes- - - - - - - - -

## I. BACKGROUND

### A. Procedural History

On September 21, 2000, Plaintiff filed a complaint in the Livingston County Circuit Court, alleging, *inter alia,* discharge in violation of public policy and age discrimination [*3] in violation of the Elliott-Larsen Civil Rights Act, *MICH. COMP. LAWS § 37.2202(1)(a)* ("Elliott-Larsen Act"). n2 Defendants removed the action to the United States District Court for the Eastern District of Michigan; thereafter they answered the complaint and filed affirmative defenses. During discovery, the district court granted Plaintiff leave to amend her complaint, at which time Plaintiff added claims of gender discrimination and retaliation in violation of the Elliott-Larsen Act.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n2 The Elliott-Larsen Act prohibits an employer from "fail[ing] or refusing to hire or recruit, discharging, or otherwise discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." *MICH. COMP. LAWS § 37.2202(a).*

- - - - - - - - - - - End Footnotes- - - - - - - - -

Following discovery. Defendants moved for summary judgment on October 1, 2001. Plaintiff filed a response and brief in opposition, and Defendants [*4] filed a reply. On November 19, 2001, the district court heard oral argument on the matter and granted Defendants' motion in its entirety. The court entered an order to that effect on November 26, 2001. Plaintiff filed a timely notice of appeal on December 5, 2001.

### B. Facts

Plaintiff is a Certified Public Accountant. In May of 1998, at the age of thirty-eight. Plaintiff accepted a position with Allmerica, which is based in Worcester. Massachusetts, to serve as the Director of Financial Operations for Allmerica's wholly-owned subsidiary. Citizens, which is based in Howell, Michigan. n3 Plaintiff also served as Citizens Treasurer. Prior to taking the job, she was interviewed by, among others, Steve Mosakowski, financial director of Allmerica Technology Services, and Ada Hamilton, who was Citizens' Head Facilitator. Mosakowski served as Plaintiff's direct supervisor.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n3 Citizens is a wholly-owned subsidiary of Hanover Insurance, which in turn is wholly-owned by Allmerica. According to deposition testimony from Kurt Gallinger, former vice president and general counsel at Citizens, Allmerica provides Citizens with its employees via contract. Thus, Plaintiff's employer was Allmerica, not Citizens.

- - - - - - - - - - - End Footnotes- - - - - - - - -

[*5]

### 1. Plaintiff's Interpersonal Conflicts

During her tenure at Allmerica, Plaintiff achieved some noteworthy successes, such as identifying nearly $ 10,000,000 in unreimbursed payments that the State of Michigan owed to Citizens. Such efforts earned her an Exceptional Service Award Nomination in 1999. However, Plaintiff also endured a number of strained relationships, particularly with Corbin Rodriguez, financial systems director for Allmerica, and Mosakowski, although it is unclear from the record who is to blame for the tension.

One such conflict between Plaintiff and Rodriguez arose over whether Citizens should maintain an "all check" claims payment policy (which had been Citizens' practice since inception) or adopt an "all

draft" claims payment policy (which would have made Citizens consistent with other Allmerica entities). Plaintiff favored drafts, while Rodriguez favored checks, despite research findings Plaintiff had gathered showing that checks would be unfavorable for various reasons. During a meeting in Worcester, Plaintiff (apparently with the encouragement of Citizens president Jim McAuliffe and Kurt Gallinger, former vice president and General Counsel at Citizens) [*6] pressed the issue; Rodriguez threw a roll of silver duct tape at Plaintiff and told her to tape her "big mouth shut." (J.A. at 266.)

Thereafter, Rodriguez published a memo announcing implementation of the check policy. Plaintiff, after failed attempts to contact Rodriguez and with McAuliffe and Gallinger's encouragement, contacted Greg Tranther, one of Rodriguez' superiors, and convinced him to maintain the draft policy. Rodriguez demanded that Mosakowski reprimand Plaintiff for insubordination, but Mosakowski declined to do so. The relationship between Plaintiff and Rodriguez thereafter continued to deteriorate.

At one point Mosakowski devised certain "communications guidelines" between Rodriguez and Plaintiff (J.A. at 269), but he thereafter refused to intervene in the conflict and would not allow Plaintiff to seek assistance from someone higher in the chain of command. Plaintiff sent a written memo to Hamilton on the issue anyway (which earned her a written reprimand from Mosakowski in the process). Plaintiff also apparently sought assistance from McAuliffe and Gallinger, who evidently were more sympathetic to Plaintiff's situation than was Mosakowski.

Relations between Plaintiff [*7] and Mosakowski were further strained by various insensitive comments made by Mosakowski. On one occasion Mosakowski referred to Plaintiff as a "glitter girl." Another time, during a group hike, Mosakowski told Plaintiff that she should lead the way because she was wearing "tight white jeans." (J.A. at 160-61.) He also made various comments during a group dinner in 1999 about certain former female employees at the Worcester location, poking fun at a heavy-set woman who wore a muumuu and women who wore excessive makeup and "slept around."

The allocation of culpability is vigorously disputed between the parties. Plaintiff attributes the breakdown in communications to Rodriguez' poor treatment of her. as well as Mosakowski's sexist comments and deaf ear to her complaints. Defendants contend that Plaintiff demonstrated a history of ignoring established lines of communication and authority.

2. Plaintiff's Opposition to Alleged Illegal Activity

On July 25, 1997, Citizens' former vice president and general counsel Karen Livingston-Wilson wrote a letter to the Michigan Insurance Bureau ("MIB") Commissioner, assuring the Commissioner of Citizens' commitment to maintaining safeguards [*8] consistent with provisions in the Michigan Insurance Code. Specifically, the letter represented, among other things, that Citizens planned to consolidate some of its bank accounts with its affiliates' bank accounts, but that the resulting consolidated account would be "structured in a way which segregates Citizens' funds within the account such that the funds belonging to Citizens are easily and readily verified by the trustee and [Michigan's insurance] regulators." (J.A. at 106.) This safeguard apparently was designed to comply with *Michigan Insurance Code § 901*, which requires an insurer to maintain assets in an amount at least equal to its liabilities and establishes a series of asset requirements to this effect. *MICH. COMP. LAWS § 500.901*. The letter further represented that Citizens would "maintain personnel in Michigan with responsibility for maintaining information regarding Citizens' contributions to the company bank account and knowledgeable concerning the account." (J.A. at 106.) This representation was designed to comply with *Michigan Insurance Code § 5256(2) and (7)*. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n4 *Michigan Insurance Code § 5256* requires an insurance company residing in the state to "produce those records relating to the insurer's business or affairs and personnel knowledgeable about the records at a principal place of doing business in or outside this state for examination within a reasonable time period specified by the commissioner. MICH. COMP. LAWS § 500.5256(2). If the insurer fails to comply, the insurance commissioner "may require a domestic insurer to transfer its domicile to another state." MICH. COMP. LAWS § 500.5256(7).*

- - - - - - - - - - - - End Footnotes- - - - - - - -

[*9]

However, within a year of Plaintiff's hire. Allmerica laid off ten of the thirteen individuals working under her supervision. Plaintiff opposed these layoffs, and she approached Mosakowski and others on several occasions, arguing that the layoffs prevented Citizens from complying with the July 25, 1997 letter's representation about maintaining knowledgeable personnel in Michigan, as well as the Michigan

Page 3

Insurance Code's requirement about retaining knowledgeable personnel.

Plaintiff also openly opposed the implementation of a "common platform" computer network for the several different Allmerica entities, which called for, among other things, the pooling of insurance policy premium receipts in a lock box. Plaintiff viewed this pooling of premium receipts as cash commingling, which she felt could potentially violate Citizens' commitment to segregating its funds from its affiliates' funds, as articulated in the July 25, 1997 letter to the MIB. She raised the issue with a number of people, including Rodriguez and Mosakowski, and urged the removal of the cash out of the common lock box and into different investment accounts, warning that a failure to do so would result in a significant [*10] loss of interest income. She was told that Allmerica was looking into the situation. Ultimately, this conflict was resolved by General Counsel Gallinger and Warren Barnes, Allmerica's controller, both of whom concluded that the common platform would not violate the terms of the July 25, 1997 letter.

Plaintiff acknowledged in her deposition that she was unaware of any *actual* violation of the letter's terms and that she never felt that she should report the perceived violation to the MIB. although nobody prohibited her from doing so.

### 3. The READY Program and Plaintiff's Termination

In the fourth quarter of 1999 (more than one year after Plaintiff's hire), Allmerica's then-new President and CEO, Robert Restrepo, n5 developed and implemented the READY program. READY was a cost-cutting measure aimed at "flattening out" Allmerica's organization by having teams of Allmerica employees examine each work position in the organization and determine whether duties could be consolidated, thus eliminating positions. Lori Manchester, a member of the READY team that eliminated Plaintiff's position, testified that READY was "idea driven" and that the team focused on job functions rather [*11] than the names of individual employees. (J.A. at 375-76.) Manchester further testified that the READY Teams considered several factors in determining who would be laid off, including which positions were expendable, rankings (i.e., the amount of contribution to the company), and salary.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - -

n5 Restrepo had been hired in May of 1998, around the same time as Plaintiff was hired. (J.A. at 387.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

In late April 2000, the READY team examining financial positions decided to eliminate Plaintiff's position. According to Manchester, the team determined that Plaintiff's position was no longer necessary, citing Plaintiff's salary ($ 95,000) as one factor in the decision, as well as Plaintiff's practice of taking personnel and accounting issues over Manchester's head to Hamilton, Restrepo, and McAuliffe. Manchester acknowledged having spoken to Mosakowski about some of these incidents, but further testified that these conversations did not influence her decision to eliminate Plaintiff's job.

The parties also dispute Mosakowski's [*12] role in the decision-making process. In response to one of Plaintiff's interrogatories, Defendants identified Mosakowski among the primary decision-makers. However, it appears undisputed that the READY financial team eliminated Plaintiff's job and that Mosakowski did not participate on any of the READY teams: Mosakowski also testified that he did not participate in the READY team's decision to terminate Plaintiff.

At any rate, Plaintiff's position was not officially filled by another person; rather, her duties were redistributed among a number of the remaining employees. Many of her managerial responsibilities were assumed by a younger male named Jason Layne, Plaintiff's former subordinate in Howell, Michigan. Layne was given a ten percent raise, but he did not ascend to the title of Director of Financial Operations, and it appears that this title no longer exists. Plaintiff's other duties were transferred to the Worcester location, including her former title of Citizens' Treasurer.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002). "Summary judgment is [*13] appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting *Fed. R. Civ. P. 56(c)*). "The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case." *Id.* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)* and *Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d*

*1382, 1388-89 (6th Cir. 1993))*. The burden then shifts to the non-movant to show that a genuine issue of material fact remains making summary judgment inappropriate. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*.

When evaluating a motion for summary judgment, we must view the evidence "in the light most favorable to the non-moving party." *Hopson, 306 F.3d at 432* (citing *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970))*. [*14] Nevertheless, the non-moving party "may not rest upon its mere allegations"; rather, the non-movant must "must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*; *see also Celotex, 477 U.S. at 324*; *Ford v. GMC, 305 F.3d 545, 551 (6th Cir. 2002)*. Moreover, the mere existence of a scintilla of evidence in support of the non-moving party's allegations will not suffice: the non-movant must produce evidence on which the jury could reasonably find for the non-moving party. *Anderson, 477 U.S. at 251*; *Copeland v. Machulis, 57 F.3d 476, 479 (6th Cir. 1995)*.

III. ANALYSIS

A. Discharge in Violation of Public Policy

Although an "at will" employee ordinarily may be terminated by an employer at any time and for any reason. Michigan allows lawsuits for discharges that are "so contrary to public policy as to be actionable." *Suchodolski v. Mich. Consol. Gas Co., 412 Mich. 692, 316 N.W.2d 710, 711 (Mich. 1982)*. A claim of discharge in violation of public policy may rest on one of three grounds: "(1) the employee is discharged in violation of an [*15] explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty. (2) the employee is discharged for the failure or refusal to violate the law in the course of employment, [or] (3) the employee is discharged for exercising a right conferred by a well-established legislative enactment." *Edelberg v. Leco Corp., 236 Mich. App. 177, 599 N.W.2d 785, 786-87 (Mich. Ct. App. 1999)* (citing *Suchodolski, 316 N.W.2d at 711-12*). A necessary predicate to establishing a discharge in violation of public policy claim is "the location of some legislative enactment to ground a finding that a discharge is in breach of public policy." *Wiskotoni v. Mich. Nat'l Bank-West, 716 F.2d 378, 382-83 (6th Cir. 1983)*. However, a plaintiff need not show that the employer actually violated the law; rather, a plaintiff need only show that the employer "requested acts that would violate Michigan's public policy." *Pratt v. Brown Mach. Co., 855 F.2d 1225, 1237-38 (6th Cir. 1988)*.

Plaintiff argues that a genuine issue of material fact remains as to whether she was terminated for a refusal to violate [*16] the law, because Allmerica requested that she review and sign bank reconciliations, even though she had no input function, and she declined to do so. Presumably, signing the reconciliations would somehow violate *Michigan Insurance Code § 500.901* and/or the safeguards articulated in Citizens' July 25, 1997 letter to the MIB, but Plaintiff fails to explain how. We are not persuaded that Plaintiff has established any violation of law or any proposed actions that would have violated the law. Rather, it appears that Plaintiff merely raised an issue as to whether any of Allmerica's actions would violate the terms in Citizens' July 25, 1997 letter to the MIB. Her concerns were passed on to upper management officials, who in turn determined that no violations had occurred or were occurring. Plaintiff has produced no evidence to the contrary.

Plaintiff also argues that a cause of action arises from her discharge in retaliation for reporting these alleged violations of the Michigan Insurance Code to Mosakowski, Rodriguez, and Gallinger. However, even assuming that Plaintiff has established on this record an actual or impending violation of the Michigan Insurance Code, we are not persuaded [*17] that Michigan has provided a "public policy" cause of action for an employee who is discharged for reporting violations of law to a superior. First of all, this factual scenario is not listed among the three public policy exceptions to the "at-will employee" rule. *See Edelberg, 599 N.W.2d at 786-87*. Second, Plaintiff has not identified, and we have not located, any controlling or persuasive Michigan case law that has extended the public policy exception to discharges in retaliation for reporting violations of law to superiors.

Plaintiff draws our attention to an unpublished case from this circuit. *Meury v. Connie Kalitta Servs./Am. Int'l Airways, Inc., 181 F.3d 102 (Table), 1999 WL 357774, at *2 (6th Cir. 1999)*. which states that "Michigan indeed recognizes a public policy exception allowing claims involving discharge in retaliation for an employee's report of a legal violation to his supervisor." We are neither bound nor persuaded by the *Meury* court's brief observation. First of all, the facts in *Meury* indicate that under the federal aviation regulations the plaintiff had an affirmative legal duty to report the violation, and therefore [*18] his reporting of the violation essentially amounted to a failure to violate the law, which Michigan case law recognizes as of one the three grounds for this type of claim. *Id*.

Moreover, in stating that a retaliatory discharge for reporting a violation of law to a superior is actionable,

Page 5

the *Meury* court relied on *Watassek v. Mich. Dep't of Mental Health,* 143 Mich. App. 556, 372 N.W.2d 617 (Mich. Ct. App. 1985), where a state mental hospital worker alleged a retaliatory discharge for reporting to his supervisor patient abuse at the hospital. The *Watassek* court reasoned that the 1981 passage of the Whistleblowers' Protection Act ("WPA") n6 after the plaintiff's 1976 termination meant that there must have existed prior thereto a common law counterpart to the WPA: consequently, it held that a public policy claim for discharge in retaliation for reporting violations to a superior (i.e., a common law counterpart to the WPA) was available in 1976. *Id. at 620.* The court was silent as to whether such a common law claim survived the WPA's passage, which essentially limited the reach of its holding to discharges occurring before the WPA's passage [*19] in 1981. Plaintiff's discharge, on the other hand, occurred in 2000, well after the passage of the WPA. Therefore, *Watassek* is not controlling. To the extent that any ambiguity remained as to whether a common law counterpart to the WPA existed after 1981, the Michigan Supreme Court resolved such ambiguity in *Dudewicz v. Norris-Schmid, Inc.,* 443 Mich. 68, 503 N.W.2d 645, 650 (Mich. 1993). where it held that the WPA now provides the exclusive remedy for employees terminated in retaliation for reporting violations of law.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n6 The WPA prohibits the retaliatory discharge of an employee who reports, or is about to report, a violation of law to a public body. MICH. COMP. Laws § 15.362.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

We recognize that the WPA's exclusive remedy does not directly control the result here, given that Plaintiff does not directly allege a WPA violation. That is, Plaintiff alleges that she was discharged in retaliation for reporting violations of law to her *superiors,* and such reporting does not fall within the [*20] ambit of the WPA. *See* MICH. COMP. LAWS § 15.362 (prohibiting discharge for reporting violations of law to a "public body"). Nevertheless, her argument that a common law cause of action lies rests on the reasoning in *Watassek,* which in turn premised a pre-1981 common law cause of action on the subsequent passage of the WPA, rather than on case law. *Watassek* is neither controlling nor persuasive.

We find more persuasive *Covell v. Spengler,* 141 Mich. App. 76, 366 N.W.2d 76, 79-80 (Mich. Ct. App. 1985) (holding that no common-law cause of action for a discharge in retaliation for reporting violations existed before passage of the WPA, which thereafter became the exclusive remedy for an employee whose employment is terminated in retaliation for reporting an employer's violation of the law), as well as *Shuttleworth v. Riverside Osteopathic Hosp.,* 191 Mich. App. 25, 477 N.W.2d 453, 454-55 (Mich. Ct. App. 1991) (declining to find a common law counterpart to the WPA). Indeed, *Shuttleworth* specifically criticized the *Watassek* court's approach, which it viewed as "nothing more than an attempt to give preenactment effect to a statutory right [*21] by fabricating a supposed preexisting common-law right wholly from the provisions of the subsequently enacted statute." *Id. at 455.* We therefore hold that Michigan does not recognize a common law cause of action for an employee who has been discharged for reporting violations of law to a superior.

In summation, Plaintiff has not established that she was asked to violate any law, and no public policy cause of action exists for a retaliatory discharge of an employee who reported alleged violations of law to a superior. Therefore, Plaintiff has failed to establish a cause of action for a public policy discharge, and we affirm the district court's grant of summary judgment on this claim.

B. Age Discrimination

In granting summary judgment to Defendants on Plaintiff's age discrimination claim, the district court concluded that Plaintiff had failed to establish a prima facie case of age discrimination. We agree and affirm the dismissal of this claim.

Generally, a prima facie case of age discrimination under the Elliott-Larsen Act requires that a plaintiff prove that he or she (1) was a member of a protected class. (2) suffered an adverse employment action, (3) was qualified [*22] for the relevant position, and (4) was replaced by a younger person. *Lytle v. Malady,* 458 Mich. 153, 579 N.W.2d 906, 916 (Mich. 1998). A terminated worker who is not replaced by a younger worker must show "evidence sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of age." *Barnes v. GenCorp,* 896 F.2d 1457, 1466 (6th Cir. 1989).

Because Plaintiff was not replaced following her termination, she cannot satisfy the fourth prong of the prima facie test. We have held that "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing

employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Id. at 1465*; *see also Sahadi v. Reynolds Chem., 636 F.2d 1116, 1117 (6th Cir. 1980)* ("Plaintiff was not replaced; his former duties were assumed by [a coworker], who performed them in addition to his other functions."). Although Plaintiff argues that [*23] she was replaced by Jason Layne, it is apparent from the record that the Director of Financial Operations position no longer exists and Plaintiff's responsibilities were distributed among various Allmerica employees. Jason Layne merely assumed some of Plaintiff's responsibilities in addition to his own and although he received a raise, he retained his title. This does not suffice for purposes of establishing the fourth prong of a prima facie case of age discrimination.

Although "the mere termination of a competent employee when an employer is making cutbacks due to economic insufficiency is insufficient to establish a *prima facie* case of age discrimination," *LaGrant v. Gulf & Western Mfg., 748 F.2d 1087, 1090 (6th Cir. 1984)*, a plaintiff nevertheless may demonstrate age discrimination in the context of a reduction in workforce. In such circumstances, a plaintiff must also provide "additional direct, circumstantial or statistical evidence that age was a factor in the termination." *Id. at 1091*.

In support of her claim, Plaintiff presented to the district court a breakdown of the number of terminations and the ages of those affected. The breakdown [*24] evinced two findings: (1) nearly 70% of the terminated employees were over the age of 40; and (2) despite Allmerica's assertion that the READY program was a cost-cutting measure, only 52 of approximately 1070 employees were terminated-- less than 5% of the workforce. However, we do not find Plaintiff's statistics to be very persuasive. For instance, it is not helpful to know that 70% of the *terminated* employees were over the age of 40, when we do not know what percentage of the *retained* employees were over the age of 40. Perhaps 70% of the surviving employees were also over the age of 40. Furthermore, the fact that only 5% of the workforce was eliminated does not contradict Allmerica's asserted cost-cutting objective. The relevant issue is not what percentage of the workforce was eliminated, but rather how much money was saved in the process. Thus, these the statistical findings do not satisfy Plaintiff's burden, and her age discrimination claim consequently must fail.

### C. Gender Discrimination

Like the age discrimination claim, Plaintiff's failure to demonstrate that she was replaced by Jason Layne or to produce other evidence raising an inference of gender discrimination [*25] forecloses her ability to establish a prima facie case of gender discrimination. However, Plaintiff alternatively argues that she provided direct evidence of gender discrimination. We disagree.

Direct evidence is evidence that "if believed requires the conclusion that unlawful discrimination was at least a motivating factor." *Harrison v. Olde Fin. Corp., 225 Mich. App. 601, 572 N.W.2d 679, 683 (Mich. Ct. App. 1997)* (quoting *Kresnak v. Muskegon Heights, 956 F. Supp. 1327.1335 (W.D. Mich. 1997)* (internal quotation marks omitted)). "For example, racial slurs by a decisionmaker constitute direct evidence that is sufficient to get the plaintiff's case to a jury." *Id.* Similarly, when a decision-maker makes a variety of statements referring to the employee's protected status, such statements may constitute direct evidence inasmuch as they permit an inference that the decision-maker adhered to stereotypes about the abilities of employees in a protected class to perform adequately. *Wexler v. White's Furniture, Inc., 317 F.3d 564, 572 (6th Cir. 2003) (en banc)* (reversing summary judgment because evidence that supervisors called the [*26] plaintiff a "bearded, grumpy old man." "pops," and "old man," suggested, at the time of his demotion, that the plaintiff was too old for the aggravation and stress of management issues, and contrasted the plaintiff's advancing age with his replacement's youth, created a genuine issue of material fact as to whether the employer held "stereotypical beliefs about the capabilities of older managers that influenced its decision to demote" the plaintiff); *DeBrow v. Century 21 Great Lakes Inc., 463 Mich. 534, 620 N.W.2d 836, 838 (Mich. 2001)* (reversing dismissal of the plaintiff's age discrimination claim because, at the time of his firing, the plaintiff was told by his superior that he "was getting too old for this shit." and this remark sufficed as direct evidence of discrimination).

In support of her contention that direct evidence exists precluding summary judgment on this claim, Plaintiff points to various offensive remarks that Mosakowski had made in her presence, including calling Plaintiff a "glitter girl" and commenting on her tight white jeans, as well as making disparaging remarks about former female employees who were overweight and/or "slept around."

Mosakowski's various disparaging remarks [*27] about various Allmerica female employees are offensive. However, they do not amount to sufficient direct evidence of discrimination because they do not, even if believed, "require[] the conclusion that

Page 7

unlawful discrimination was at least a motivating factor." *Harrison, 572 N.W.2d at 683*. Unlike the statements in *DeBrow, 620 N.W.2d at 838*, and *Wexler, 317 F.3d at 572*, Mosakowski's statements neither were made in the context of Plaintiff's termination nor evidenced a stereotypical belief on his part that women were incapable of performing the functions of their jobs.

More importantly, Mosakowski was not a primary decision-maker in Plaintiff's termination. It is undisputed that Plaintiff's job was eliminated by the READY team, of which Mosakowski was not a member. Similarly, we are not persuaded, on this record, that Mosakowski played any meaningful role in the decision to terminate Plaintiff, such as recommending to the READY Team that it eliminate Plaintiff's position. *Cf. Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 354-55 (6th Cir. 1998)* (observing that "remarks by those who did not independently have [*28] the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate plaintiff, are relevant"). Because Plaintiff produced neither direct nor circumstantial evidence of gender discrimination, the district court correctly dismissed Plaintiff's gender discrimination claim.

### D. Retaliation

Finally, Plaintiff appeals the district court's grant of summary judgment to Defendants on her retaliation claim. To survive summary judgment on a retaliation claim. Plaintiff must show a prima facie case by establishing that (1) she engaged in protected activity; (2) Defendants knew of this exercise of her protected rights; (3) Plaintiff was subjected to an adverse employment action: and (4) there is a causal connection between the protected activity and the adverse employment action. *See Canitia v. Yellow Freight Sys., Inc., 903 F.2d 1064, 1066 (6th Cir. 1990)* (*per curiam*) (citations omitted); *DeFlaviis v. Lord & Taylor, Inc., 223 Mich. App. 432, 566 N.W.2d 661, 663 (Mich. 1997)* (citations omitted).

Although genuine issues of material fact exist with respect to [*29] the first, second, and third prongs, Defendants contend that Plaintiff cannot establish causation on this record. We agree. In order to show a causal connection. Plaintiff must submit evidence from which an inference can be drawn that the adverse action would not have occurred but for her complaints of discrimination or harassment. *Allen v. Mich. Dep't of Corr., 165 F.3d 405, 413 (6th Cir. 1999)* (citations omitted). Although adverse action taken shortly after an exercise of a plaintiff's protected rights is relevant to the causation inquiry, *id.*, temporal proximity alone is generally insufficient to establish a causal connection for a retaliation claim. *See Little v. BP Exploration, 265 F.3d 357, 359 (6th Cir. 2001)*; *Nguyen v. City of Cleveland, 229 F.3d 559, 566 (6th Cir. 2000)*.

In this case, Plaintiff cannot prove a causal connection because none of the individuals to whom Plaintiff complained were on the READY team. Although Plaintiff insists that Mosakowski was a primary decision-maker, as we already discussed with respect to the gender discrimination claim, the record does not support her assertion. The temporal proximity [*30] between Plaintiff's alleged complaints and her termination does not suffice to establish the fourth prong on this record, given that the persons to whom (and about whom) Plaintiff complained were not a part of the decision-making process. *Little, 265 F.3d at 359*. Therefore, we affirm the dismissal of this claim.

### IV. CONCLUSION

For all the foregoing reasons, the judgment of the district court is **AFFIRMED.**