# EXHIBIT I

CARLTON B. PARKS, Plaintiff-Appellant, v. CITY OF CHATTANOOGA; JIMMY DOTSON, Chief; W. SHELLEY PARKER; STEVEN M. PARKS, Defendants-Appellees.

No. 01-6543

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

2003 U.S. App. LEXIS 14471

July 16, 2003, Filed

**NOTICE:**

**PUB-STATUS: [*1]** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Eastern District of Tennessee. 99-00090. Edgar. 11-06-01.

**DISPOSITION:** AFFIRMED.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant former city police officer sought review of a summary judgment from the United States District Court for the Eastern District of Tennessee entered in favor of appellees, a city, its police chief, and two other police department employees, in the officer's discrimination action under Title VII, *42 U.S.C.S. § 2000e* et seq., *42 U.S.C.S. §§ 1981,* 1985(3), and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 et seq.

**OVERVIEW:** The officer was fired after a sexual assault complaint was filed against him. The officer contended that he was discharged due to his race and in retaliation for having expressed complaints of racial discrimination in the workplace. He further claimed that a supervisor created a racially hostile work environment and that his due process rights were violated in a disciplinary proceeding. The court affirmed the judgment, finding that the officer did not produce sufficient evidence to support his claims. Although the officer engaged in protected activity when he expressed complaints, the court found nothing in the record, other than a generous construction of the officer's "timing" argument, that supported an inference that his termination was connected to his protected communications. Further, the record contained no evidence that the police chief terminated the officer because of his race. Additionally, the officer's allegations of racial harassment by a lieutenant were insufficient to support a finding of a hostile work environment. Finally, the court found that the officer was given all the pretermination process required by the Fourteenth Amendment.

**OUTCOME:** The court affirmed the judgment.

**CORE TERMS:** termination, retaliation, summary judgment, prima facie case, harassment, protected activity, internal affairs, racial discrimination, pretermination, apartment, paycheck, notice, protected conduct, protected speech, hostile work environment, criminal investigation, race discrimination, failed to present, police officer, sexual assault, disciplinary, protected class, posttermination, sufficient evidence, report prepared, investigators, supervisors, terminated, fingernail

**COUNSEL:** For CARLTON B. PARKS, Plaintiff - Appellant: August C. Winter, Brentwood, TN.

For CITY OF CHATTANOOGA, JIMMY DOTSON, W. SHELLEY PARKER, STEVEN M. PARKS, Defendants - Appellees: Phillip A. Noblett, Nelson, McMahan & Noblett, Michael A. McMahan, Chattanooga, TN.

**JUDGES:** BEFORE: CLAY and ROGERS, Circuit Judges; Coffman, District Judge. * CLAY, Circuit Judge, concurring in part dissenting in part.

* The Honorable Jennifer B. Coffman, United States District Judge for the Eastern and Western Districts of Kentucky, sitting by designation.

**OPINIONBY:** Jennifer B. Coffman

**OPINION:** COFFMAN, District Judge. Carlton B. Parks ("Parks"), a former police officer with the Chattanooga Police Department ("Department"), filed suit against **[*2]** both the City of Chattanooga ("City") and three officers employed by the Department, alleging that he was fired from his job as a patrolman due to his race and in retaliation for having expressed

complaints of racial discrimination in the workplace. He further claimed that one of his supervisors created a racially hostile work environment and that the Department violated his due process rights when it allegedly failed to notify him properly of disciplinary charges made against him and withheld his final, post-termination paycheck until he returned some of the Department's property. The district court granted summary judgment in favor of the defendants, concluding that Parks did not produce sufficient evidence to support his claims. For the reasons set forth below, we **AFFIRM.**

## I. Background

### A. Factual Background

Parks, an African-American male, served as a Chattanooga police officer from June 19, 1987, until March 13, 1998, when he was fired by the City's Chief of Police, J.L. Dotson ("Chief Dotson"). Parks had a history of making complaints of racial discrimination within the Department. On June 5, 1995, while he was president of the Chattanooga Area Law Enforcement Association, [*3] an organization formed to advocate minority rights, he wrote a letter to then-Chief of Police, Ralph Cothran, which complained about the lack of minority representation within the Department. On December 13, 1997, he wrote a letter to a superior officer, Captain Skip Vaughn, requesting the inclusion of a diversity clause in the Department's transfer policy. On January 4, 1998, he sent a letter to another superior officer, Captain Charles Cooke ("Captain Cooke"), which suggested that he had various concerns about his treatment within the Department and believed that the Department was selectively enforcing its facial hair policy. On January 12, 1998, Parks sent a formal complaint to Chief Dotson which accused two of his superior officers, Captain Cooke and Lieutenant Marvin Fuson ("Lieutenant Fuson"), of falsifying officer performance statistics and unfairly distributing work due to an allegedly "racist mentality." A day later, he sent the head of the Department's Internal Affairs Division, Captain Steven Parks ("Captain Parks"), a similar complaint, adding that he also believed that it was unfair that his supervisors had not enabled him to attend seminars or make use of a particular [*4] police car. Parks's 1998 complaints were assigned for investigation to Captain Steven Parks ("Captain Parks"). Another police officer, Sergeant Phillip Grace, corroborated many of Parks's allegations. Nevertheless, the Department's investigation exonerated the accused officers of the allegation of falsifying performance statistics.

On January 21, 1998, Parks became the subject of an Internal Affairs investigation, as well as a major criminal investigation, when an eighteen-year-old woman, LaShundra Brown ("Brown"), reported that he had entered her apartment without permission and sexually assaulted her while on duty. These investigations ultimately led to Parks's termination from the Department and, on February 5, 1998, to his indictment on charges of rape, sexual battery, and official oppression. n1 The Internal Affairs investigation into Brown's allegations was supervised by Captain Parks -- the same official investigating Parks's complaints of racial discrimination within the Department. On the day of the alleged sexual assault, the Department took a statement from Brown. She reported that Parks entered her apartment uninvited at approximately 8:50 a.m. on January 21, 1998, as [*5] she was in the shower. She stated that he peeked at her while she was naked and that she then quickly dressed herself and led him to another part of her apartment. She recounted that he asked her questions about a particular suspect whom he was allegedly seeking and then, without invitation or prompting, began touching her. Although she resisted, Brown told investigators that Parks forcibly overcame her. Brown further maintained, however, that just as Parks was about to subject her to sexual intercourse, he received a call on his police radio directing him to Arlington Avenue. She stated that Parks quickly pulled up his trousers and left her apartment, returning later in the day to give her $ 20.00 to remain quiet about the incident. Brown also told investigators that when Parks allegedly assaulted her, he was wearing white boxer shorts with red or maroon on them. The underwear worn by Parks on the day in question, later obtained as evidence, were white boxer shorts with red, green and gray vertical stripes.

- - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - -

n1 The criminal charges against Parks were dismissed on September 8, 1998, after an assistant district attorney failed to realize that fingernail clippings taken from Parks contained Brown's DNA. Because the dismissal was with prejudice, the charges against Parks could not be reinstated under Tennessee law.

- - - - - - - - - - End Footnotes- - - - - - - -
- - - - -

[*6]

Parks was interviewed on the day of the alleged assault by Officer Tim Carroll, the officer supervising the criminal investigation. Although Parks admitted that he had seen Brown on the day in question, he denied her sexual assault accusations. He alleged that he had seen Brown after he completed a stop at Belle Arbor

Avenue and that he did not receive a call directing him to Arlington Avenue that day; the latter statement was supported by the Department's dispatch records. Parks further claimed that Brown initiated their interaction, flagging him down outside her apartment and inviting him inside to discuss the whereabouts of a suspect. Following a brief discussion regarding the suspect, Parks said, he left Brown's apartment without incident and did not interact with her again. Finally, Parks told Carroll that, due to his recent weight gain, the top of his underwear was sometimes visible over his belt. This last detail was somewhat corroborated by the person who placed the call from Belle Arbor Avenue on the morning of the alleged assault, as that person told investigators that Parks had his gun belt hanging low.

The investigators took various steps, such as obtaining Parks's fingernail [*7] clippings, using a rape kit on Brown, and administering a lie detector test to Brown (which she passed) and offering to administer such a test to Parks (which he declined to take), to ascertain the truth. These efforts were not immediately conclusive, however, as Chief Dotson acknowledged that the investigation essentially yielded Brown's word against Parks's.

Nonetheless, the Department immediately placed Parks on paid administrative leave and, in a February 9, 1998, report prepared by Captain Parks, recommended disciplinary action for conduct unbecoming an officer, a recommendation reviewed and agreed with by the Department's attorney. On February 19, 1998, Chief Dotson mailed Parks a notice that ordered him to attend a hearing "concerning allegations that on the morning of January 21, 1998, [he] entered the apartment of an 18 year old woman ... and committed unwanted and illegal sexual acts upon her." Chief Dotson's notice also advised Parks that he would have an opportunity to respond to Brown's allegations, explained that he could have an attorney present during the hearing, and warned him that the situation was extremely serious and could result in his termination.

The Department [*8] held Parks's pretermination hearing on March 10, 1998. Prior to the hearing, Parks's attorney was permitted to review the criminal investigation file n2 but was not allowed access to the Internal Affairs report prepared by Captain Parks. n3 Parks, his attorney, Chief Dotson, the Department's attorney, a court reporter, and several officers who had been involved in the Internal Affairs investigation attended the hearing. During the proceedings, Chief Dotson did not provide further details of Brown's allegations, refused to grant Parks's attorney's request to postpone the hearing until the DNA test results on Parks's fingernail clippings were received, refused to

allow Parks's attorney to ask questions about the complaints Parks had filed against his supervisors, and failed to ask Parks any questions or to present any evidence. Instead, according to Parks, Chief Dotson simply read a general description of Brown's allegations and allowed Parks to deny those allegations. At the conclusion of the hearing, Parks and his attorney left the room and Chief Dotson asked his assembled advisors if anyone had any reservations about finding Parks guilty. There were no negative responses. Ultimately, [*9] however, the decision to terminate Parks was Chief Dotson's alone.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n2 According to Chief Dotson's March 13, 1998, termination letter, the criminal file reviewed by Parks's attorney included an initial incident report, Brown's statement, a statement from a person who lived near Brown which supported Brown's allegations, Parks's statement to Officer Carroll, and other unspecified reports.

n3 Although Parks claims that Chief Dotson denied his attorney's request to examine the internal affairs report prepared by Captain Parks, nothing in the appellate record supports that assertion. Captain Parks averred that he was not aware of a request to see his report prior to the hearing. Nonetheless, the Court accepts the appellant's assertion for the purpose of this appeal.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

By letter dated March 13, 1998, Chief Dotson informed Parks that he had been terminated for sexually assaulting Brown. More specifically, Chief Dotson told Parks that he had violated two rules of the Department: (1) engaging in conduct unbecoming [*10] an officer and (2) failing to cooperate with an investigation. Chief Dotson explained that "as a result of these violations and [Parks's] record with the Police Department," Parks's termination was effective immediately.

After his termination, Parks decided to keep his police uniform and other items belonging to the Department for use as evidence in the upcoming criminal trial concerning Brown's allegations. The Department sent him a letter dated November 3, 1998, threatening him with criminal prosecution if he did not return the items and offering to hold separately any items he wanted to preserve as evidence. The Department also withheld

Parks's final paycheck for more than two years pending the return of its uniform and equipment, even though the 1998 W-2 form the City of Chattanooga sent to Parks included the still-withheld amount in Parks's income. Parks finally received the withheld funds on August 17, 2000, when he returned the Department's property.

## B. Procedural Background

Parks filed this action on March 10, 1999. On December 1, 1999, he amended the complaint to allege that the City, Chief Dotson, and several of the officers involved in the investigations stemming [*11] from Brown's allegations had violated his free speech and due process rights under the *First* and *Fourteenth Amendments* and had committed unlawful discrimination against him in violation of Title VII, *42 U.S.C. § 2000e, et seq.; 42 U.S.C. §§ 1981 and 1985(3)*; and the Tennessee Human Rights Act ("THRA"), *Tenn. Code Ann. § 4-21-101, et seq.* On July 30, 2001, the defendants moved for summary judgment. On October 2, 2001, the district court granted the defendants' motion. On October 17, 2001, Parks filed a timely motion for reconsideration pursuant to *Fed. R. Civ. P. 59(e)*, which the district court denied on November 6, 2001. On November 30, 2001, Parks filed this appeal.

## II. Standard of Review

This Court reviews *de novo* a district court's order granting summary judgment. *Bush v. Dictaphone Corp., 161 F.3d 363, 367 (6th Cir. 1999).* The Court must view all of the evidence in the light most favorable to Parks and may affirm the district court's decision in favor of the defendants only if there is no genuine issue of material fact and the defendants were entitled to judgment as a matter of law. *Id. at 368.* [*12]

## III. Analysis

Parks's appeal presents three questions: (1) whether the district court correctly concluded that he failed to present sufficient evidence of causation to sustain his retaliation claims; (2) whether the district court correctly concluded that he failed to present sufficient evidence to sustain his racial discrimination claims; and (3) whether the district court erred in dismissing his due process claims.

## A. Parks's Retaliation Claims

The district court properly dismissed Parks's *First Amendment* and Title VII retaliation claims. To establish a *prima facie* case of unlawful retaliation, Parks was required to show, among other things, that

he engaged in protected activity and that his protected activity was a substantial or motivating factor in his discharge. *See, e.g., Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 286, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977); Johnson v. Univ. of Cincinnati, 215 F.3d 561, 578-79 (6th Cir. 2000).* Parks's June 5, 1995, letter to former Chief Ralph Cothran complained about the lack of minority representation within the Department. His December 13, 1997, letter to Captain Skip Vaughn [*13] recommended one possible remedy for that perceived problem: the adoption of a diversity clause in the Department's transfer policy. Finally, in his two complaints of January 1998, he accused two of his supervisors of committing racial discrimination in a governmental workplace. Hence, with respect to these communications, n4 the district court correctly found that Parks addressed matters of sufficient public concern that he was engaged in protected activity. *See Johnson, 215 F.3d at 579* (complaining to others about allegedly unlawful workplace practices is protected by Title VII); *Perry v. McGinnis, 209 F.3d 597, 608-09 (6th Cir. 2000)* (complaint of racial discrimination by government employer is protected speech under the *First Amendment*).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n4 The court does not decide whether Parks's January 4, 1998, letter to Captain Cooke was protected under the *First Amendment* or Title VII.

- - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The district court also correctly found, however, that Parks did not present sufficient evidence to [*14] show that his termination was causally connected to any of his protected conduct. The only significant evidence of causation which Parks presented was that he was fired approximately two months after he sent his complaints to Chief Dotson and Captain Parks. n5 Such temporal proximity alone, however, does not support an inference of retaliatory discrimination, particularly where, as here, an employee's discharge is readily explainable on non-retaliatory grounds that have not been shown to be pretextual. *See, e.g., Johnson, 215 F.3d at 582-83* (citing *Cooper v. North Olmsted, 795 F.2d 1265, 1272-73 (6th Cir. 1986)).* Despite his assertions to the contrary, Parks did not present any evidence of unusual or unequal retaliatory treatment of the kind addressed in *Cockrel v. Shelby County Sch. Dist., 270 F.3d 1036 (6th Cir. 2001),* n6 or any other evidence to undermine Chief Dotson's stated reason for firing him -- that he believed Brown's

allegations of sexual assault. Thus, he failed to produce genuine evidence which would allow a reasonable jury to conclude that his discharge was related to his protected conduct. *See, e.g. Nguyen v. City of Cleveland, 229 F.3d 559, 567 (6th Cir. 2000).* [*15]

---------------Footnotes----------------

n5 Parks's reliance on the close timing of events is undercut by the intervention of Brown's complaint of sexual assault between his protected activity and his termination. Nonetheless, this court will take as facially valid his argument that the timing of events is suspect.

n6 In *Cockrel,* this Court reversed a district court's grant of summary judgment on the issue of causation because the plaintiff there -- a schoolteacher who taught her students about industrial hemp -- had produced enough circumstantial evidence to support a jury verdict in her favor. *See 270 F.3d at 1056.* The *Cockrel* plaintiff showed that, soon after she engaged in protected activity, she became subject to selective, irregularly timed performance evaluations and investigations which were not explainable on grounds independent of her protected conduct. Furthermore, deposition testimony in *Cockrel* showed that the defendants had considered complaints about the plaintiff's protected activity in deciding to terminate her. No such facts are present in this case.

------------End Footnotes----------------

[*16]

Parks counters that Chief Dotson had a policy of giving police officers the benefit of the doubt in resolving charges of official misconduct and that the Department's policy was to give an accused officer access to the Department's internal report before disciplinary action was taken against him. He insists that Chief Dotson did not give him the benefit of these policies as evidenced by his admission that the charges against Parks were based largely, if not exclusively, upon Brown's testimonial evidence n7 and by his refusal to allow Parks's attorney to review the Department's internal report concerning Brown's allegations. Parks also contends that the Department's decisions to withhold his pay until he returned the Department's property and to threaten him with prosecution if he did not return that property, as well as

the City's failure to reflect in his 1998 W-2 that he did not actually receive his final paycheck that year, constitute evidence of discriminatory intent. Even viewing these additional facts in a light most favorable to the plaintiff, however, they do not suggest a causal link between Parks's protected activity and his termination.

---------------Footnotes----------------

n7 At the time of Parks's termination, the DNA results on Parks's fingernail clippings had yet to be received. Parks's attorney asked for a continuance of the March 10, 1998, hearing until the DNA results were completed, a request which Chief Dotson denied. Parks has not shown that Chief Dotson's denial of his attorney's request was unusual and the court does not otherwise comment on the propriety of Chief Dotson's decision.

------------End Footnotes----------------

[*17]

As an initial matter, Parks misrepresents Chief Dotson's "benefit of the doubt" policy. Chief Dotson testified that he generally gives police officers the benefit of the doubt when considering disciplinary action against them, depending on the severity of the accusations made against each officer; he did not say that he always gives officers the benefit of the doubt. Parks failed to present any evidence to the district court that Chief Dotson accorded a similarly situated police officer different treatment than he received. *See Nguyen, 229 F.3d at 563* (temporal proximity and proof that comparable employees were treated differently may be sufficient to show *prima facie* case); *see also Thaddeus X v. Blatter, 175 F.3d 378, 399 (6th Cir. 1999).* Nor did he present any evidence that Chief Dotson had any doubts about the truth of Brown's allegations. n8 Furthermore, even accepting that Chief Dotson refused to give him access to the Department's internal report, Parks failed to produce any genuine evidence that such refusal was related to his protected conduct. n9 With respect to the claims involving his final paycheck, Parks did not present evidence [*18] that similarly situated white police officers were given more favorable treatment in comparable situations or any other evidence which would enable a jury to divine the existence of retaliatory intent. Nothing in the record, other than a generous construction of Parks's "timing" argument, supports an inference that Parks's termination was connected in any way to his protected

communications. Therefore, the district court did not err in dismissing Parks's retaliation claims. n10

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 During oral argument, Parks's counsel claimed that there was ample evidence before the district court that Chief Dotson wrongly chose to believe Brown's allegations. Whether Chief Dotson exercised good judgment is not the issue, however; the issue is whether he exercised his judgment for an illicit reason. *See Smith v. Leggett, 220 F.3d 752, 762 (6th Cir. 2000)* (citation omitted).

n9 Contrary to Parks's assertion, the appellate record does not contain evidence that Chief Dotson normally allowed officers in Chattanooga to review an Internal Affairs report during a disciplinary hearing. Instead, Chief Dotson stated only that he followed such a practice in Houston -- his former city of employment.

[*19]

n10 Our conclusion that the plaintiff did not establish a *prima facie* case of retaliatory discharge obviates the need to address whether the defendants would have made the same decision even in the absence of the plaintiff's protected conduct. *See Mt. Healthy, 429 U.S. at 287.* Furthermore, since the defendants would have borne the burden of establishing the "same decision anyway" defense, and since this case was before the district court upon the defendant's motion for summary judgment, that defense would likely have required a jury's determination. *See Johnson, 215 F.3d at 584 (Mt. Healthy* defense is a question of fact for the jury); *see also Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986)*(Where moving party has the burden of proof on an issue, he must show that "no reasonable trier of fact could find other than for the moving party.").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

## B. Parks's Racial Discrimination Claims

The district court also properly dismissed Parks's claims of racial discrimination (i.e., disparate treatment

and hostile work environment) [*20] under *42 U.S.C. §§ 1981 and 1985(3)*, Title VII, and the THRA, n11 as Parks failed to present any evidence that Chief Dotson terminated him because of his race and also failed to show that he was subjected to a racially hostile work environment.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 Claims under Title VII and *§ 1981* involve the same *prima facie* elements. *Johnson, 215 F.3d at 573 n. 5.* Similarly, the analytical framework for assessing Title VII claims applies to claims under the THRA. *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc., 173 F.3d 988, 993 (6th Cir. 1999)* (citation omitted). The parties have not separately addressed Parks's claim under *§ 1985(3)*, which would require proof that two or more persons conspired to deprive him of his constitutional civil rights. *See Dickerson v. Alachua County Com'n, 200 F.3d 761, 766 (11th Cir. 2000).* The *§ 1985(3)* claim fails for the same reason his retaliation and discrimination claims fail: it is not supported by genuine evidence.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

[*21]

To establish a *prima facie* case of disparate treatment, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for his job and performed it satisfactorily; (3) despite his qualifications and performance, he suffered an adverse employment action; and (4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class. If the plaintiff is able to do so, a presumption of discrimination arises and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its adverse action. If the defendant carries this burden, then the plaintiff must prove that the proffered reason was actually a pretext to hide unlawful discrimination. *See, e.g., Johnson, 215 F.3d at 572-73* (citations omitted).

To establish an arguable case regarding pretext; Parks needed to present evidence that the proffered reason for his termination (1) had no basis in fact; (2) did not actually motivate Chief Dotson's decision; or (3) was insufficient to justify Chief Dotson's decision. *See id. at 573 (*citing *Wheeler v. McKinley Enters., 937 F.2d 1158, 1162 (6th Cir. 1991)).* [*22] Parks did not

present any such evidence. Accordingly, there was no basis for a jury to conclude that Chief Dotson's stated reason for firing Parks was false and that the actual reason he fired Parks was due to Parks's race. n12

-------------- Footnotes ---------------

n12 Our determination that the district court properly concluded that Parks failed to show pretext makes it unnecessary for us to decide whether the district court erred in its alternative holding that Parks failed to establish a *prima facie* case of disparate treatment.

------------ End Footnotes- ---------------

To establish a *prima facie* case in support of his hostile work environment claim, Parks needed to show: (1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on race; (4) that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. *See Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999).* [*23] In determining whether there was a hostile or abusive work environment, we look to the totality of the circumstances. *See Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 141 L. Ed. 2d 662, 118 S. Ct. 2275, (1998)* (citing *Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)).* Specifically, we consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris, 510 U.S. at 23.* "Title VII is not 'a general civility code for the American workplace,'" *Burnett v. Tyco Corp., 203 F.3d 980, 982 (6th Cir. 2000),* and "personal conflict does not equate with discriminatory animus." *See Morris v. Oldham County Fiscal Court, 201 F.3d 784, 791 (6th Cir. 2000).* Thus, we must carefully distinguish between lawful conduct -- even if insensitive -- and discriminatory harassment. *Bowman v. Shawnee State Univ., 220 F.3d 456, 464 (6th Cir. 2000).* Furthermore, "simple teasing, offhand comments, and [*24] isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher, 524 U.S. at 778 (1998).*

Viewing the record in its totality and in a light most favorable to the plaintiff, this Court agrees with the district court's conclusion that Parks's allegations of racial harassment by Lieutenant Fuson were insufficient to support a finding that he had been subjected to an objectively hostile work environment. Parks alleged that Lieutenant Fuson enforced the Department's facial hair policy against him one time in a selective fashion; favorably falsified the statistics of a white officer so that he could grant that officer preferential job assignments; "loaned out" Parks more than his fellow officers; and failed to offer Parks any seminar or training opportunities for two years. Parks failed to show how frequently such conduct occurred. None of Parks's allegations involved claims of physical threats or intimidation, nor did they involve claims that Lieutenant Fuson forced him to endure ridicule or embarrassment. Furthermore, since Lieutenant Fuson's alleged harassment did not prevent Parks from performing [*25] his duties as a police officer, but only denied him certain work assignments that Parks would have preferred, his conduct would not cause a reasonable person to believe that his work environment was abusive or hostile. *Cf. Kelleher v. Flawn, 761 F.2d 1079, 1086 (5th Cir. 1985)* (subjective perception that one job is more desirable than another is not dispositive). Although Lieutenant Fuson's alleged conduct may have been impolite, inconsiderate, and even unfair, it did not rise to the level of the sort of severe or pervasive harassment that is actionable under Title VII. *See generally Bowman, 220 F.3d at 464.* Accordingly, Parks was not entitled to submit his racial harassment claim to a jury.

## C. Parks's Due Process Claims

Finally, Parks claims that his procedural due process rights were violated because he was not given sufficient notice of the charges against him during the March 10, 1998, pretermination hearing. He specifically alleges that he was not informed that he had been charged with failing to cooperate with the investigations into Brown's allegations and was not told that his past record with the Department would be considered. [*26] Even assuming the truth of these allegations, however, Parks may not bring a Due Process claim under *42 U.S.C. § 1983* in this case.

"In *section 1983* damage suits for deprivation of property without procedural due process[,] the plaintiff has the burden of pleading and proving the inadequacy of state processes, including state damage remedies[,] to redress the claimed wrong." *Mansfield Apartment Owners Ass'n v. Mansfield, 988 F.2d 1469, 1475 (6th Cir. 1993)* (citations omitted); *see also Sutton v. Cleveland Bd. of Educ., 958 F.2d 1339, 1349 (6th Cir. 1992)* (citing *Parratt v. Taylor, 451 U.S. 527, 564, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981)).* Absent a

proven allegation that the City's postdeprivation processes are inadequate to redress Parks's complaints, we cannot conclude that he lost his job as a patrolman without due process of law under the *Fourteenth Amendment. See Parratt, 451 U.S. at 537.* Parks did not allege or show that a postdeprivation appeal of Chief Dotson's decision, n13 or a subsequent tort action in state court, would be inadequate to correct Chief Dotson's failure to give [*27] him notice of the charge that he failed to cooperate with the investigations. Thus, his procedural due process claim was defective from the outset.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n13 Parks could have appealed Chief Dotson's decision to the City Council pursuant to Chattanooga City Code, § 2-185. Parks decided not to perfect such an appeal, and thus waived his right to any such posttermination hearing. *See Leary v. Daeschner, 228 F.3d 729, 744 (6th Cir. 2000).*

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Furthermore, the district court properly determined that, even if he were entitled to bring a procedural due process action under *§ 1983* in this case, Parks's procedural due process rights were not violated. Once a public employee acquires a property interest in his job, n14 he may not be terminated without some sort of pretermination hearing. *See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985).* The pretermination process need not always be elaborate, however; the amount of process depends, in part, [*28] on the importance of the competing interests at stake. *See id.* n15 Additionally, the adequacy of pretermination procedures may be affected by the availability of more elaborate posttermination review. *See, e.g., Leary, 228 F.3d at 743* (citation omitted). Even though something less than a full adversarial evidentiary hearing is sufficient prior to adverse governmental action, the employee must generally be afforded "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill, 470 U.S. at 546* (citation omitted).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n14 The parties do not dispute that Parks had a property interest in his job, as he could be terminated only "for cause." *See*

*Leary, 228 F.3d at 742 (6th Cir. 2000); Williams v. Kentucky, 24 F.3d 1526, 1537-38 (6th Cir. 1994).*

n15 The specific dictates of due process are determined by considering factors such as the employee's interest in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination. *See Loudermill, 470 U.S. at 542-43. (1985)* (citing *Mathews v. Eldridge, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976)).*

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*29]

Although Parks complains that his attorney was not given access to the Internal Affairs report prepared by Captain Parks prior to or during the hearing, he does not deny that his attorney's pretermination review of the criminal investigation file enabled him to gain a sufficient understanding of the Department's evidence against him. Moreover, in light of Parks's access to the criminal investigation file, the Department was not required to share its internal report with Parks in order to comply with due process. *Cf. Derstein v. Kansas, 915 F.2d 1410, 1413 (10th Cir. 1990)* (failure to notify employee of personnel officer's internal investigation was not significant where employee ultimately received notice of the charges and an opportunity to respond). Parks does not deny that he was given the most fundamental requirement of procedural due process on these facts: an opportunity to respond to Brown's allegations. *See Loudermill, 470 U.S. at 546.* Nor does he claim that he was given inadequate notice of Brown's allegations prior to the hearing or of the disciplinary consequences that he faced if her allegations were sustained. Rather, he claims only [*30] that Chief Dotson's February 19, 1998, notice was inadequate because it did not give him advance notice that he was also charged with failing to cooperate with the investigations. n16

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n16 In his brief, Parks also mentions that he was not told that his employment record with the Department would be considered during the March 10, 1998, hearing. Appellant's Brief at 9,23. He has not, however, presented any authority to suggest that such an omission was

violative of procedural due process. There is no requirement that a government employer detail every factor or consideration which may affect its disciplinary decisions; rather, the employer is required only to give notice of the charges made against an employee. *See Loudermill, 470 U.S. at 546; see also Butler v. Rio Rancho Bd. of Educ., 245 F. Supp.2d 1188, 1195-96 (D. N.M. 2002)* (failure to give advance notice that student's prior disciplinary record would be considered not violative of due process).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In his March 13, 1998, letter **[*31]** terminating Parks, Chief Dotson explained that the reason he found Parks guilty of a charge of failing to cooperate with the investigation was that he believed Parks had refused to answer questions regarding Brown's allegations honestly. We do not believe that due process required Chief Dotson to caution Parks further that dishonesty during the hearing would warrant a separate charge of misconduct. To require the Department to have advised Parks of all of the types of misconduct during his hearing that could have resulted in additional disciplinary charges against him would intrude to an unwarranted extent on the government's interest in conducting efficient disciplinary proceedings and would not have significantly aided Parks in responding to Brown's sexual assault allegations. Furthermore, the risk that Chief Dotson made an erroneous assessment of Parks's credibility was adequately covered by the availability of posttermination proceedings in the City Council, which Parks chose not to use. *See Leary, 228 F.3d at 744* (posttermination processes are better suited to discovery of employer's mistakes) (citation omitted); *Buckner v. City of Highland Park, 901 F.2d 491, 497 (6th Cir. 1990).* **[*32]** Therefore, the Court finds that Parks was given all the pretermination process required by the *Fourteenth Amendment.*

Finally, to the extent that Parks claims that the withholding of his final paycheck until he returned the Department's property was a violation of his substantive due process rights, n17 that claim is barred. Where, as here, the plaintiff alleges an interference with a "specific benefit, term, or condition of employment" that does not affect the "tenured nature of employment," he may seek relief only by "a state breach of contract action and not by a federal action" based on substantive due process. *See Charles v. Baesler, 910 F.2d 1349, 1354-55 (6th Cir. 1990);*

*Ramsey v. Bd. of Educ. of Whitley County, 844 F.2d 1268, 1274-75 (6th Cir. 1988).*

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - -

n17 Although Parks has not clearly alleged a violation of his substantive due process rights, he relies on a case, *Genusa v. Mumphrey, 931 F.2d 11, 13 (5th Cir. 1991),* which considered whether a fire department's withholding of a fireman's pay might be actionable as a substantive violation of the *Fourteenth Amendment.*

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

**[*33]**

## IV. Conclusion

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**

**CONCURBY:** CLAY (In Part)

**DISSENTBY:** CLAY (In Part)

**DISSENT:** CLAY, Circuit Judge, concurring in part and dissenting in part. I concur in the majority opinion as to the claims brought by Plaintiff, Carlton B. Parks, for race discrimination and denial of due process; however, because Plaintiff proffered sufficient evidence to create a genuine issue of material fact as to his claim for unlawful retaliation, I respectfully dissent on that issue.

Contrary to the majority's assertion, the evidence adduced by Plaintiff as to his retaliation claim amounts to more than a "generous construction" of Plaintiff's "timing" argument. In making this assertion, the majority fails to view the evidence and all reasonable inferences derived therefrom in the light most favorable to Plaintiff in contravention of the summary judgment standard. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* For example, the majority dismisses Plaintiff's allegations regarding Chief Dotson's policy of giving officers the benefit of the doubt in cases involving **[*34]** police misconduct under circumstances where it is the officer's word against a citizen's, and a credibility determination must be made. The majority uncritically accepts Chief Dotson's testimony that he had not always given officers the benefit of the doubt. Even assuming Chief Dotson's testimony in this regard to be true, a factual issue remains as to whether he failed to give Plaintiff the benefit of the doubt in *this* case as a result of Plaintiff's complaints of race discrimination. The

majority claims that Plaintiff has failed to adduce any evidence to indicate that the reason Chief Dotson failed to give Plaintiff the benefit of the doubt was because of race; however, Plaintiff has shown temporal proximity of Chief Dotson's actions to Plaintiff's protected claims of race discrimination, and Chief Dotson has failed to provide any reason as to why he chose not to give Plaintiff the benefit of the doubt. Thus, viewing Chief Dotson's actions in the light most favorable to Plaintiff, an inference of unlawful motivation is created sufficient to establish a triable issue for the jury. *See id.*

In addition, the majority claims that Plaintiff failed to present evidence that Chief [*35] Dotson had any doubts about the truth of LaShundra Brown's allegations. The majority dismisses Plaintiff's claims made at oral argument that there was ample evidence before the district court as to the validity of Brown's allegations by noting that the issue is not whether Chief Dotson exercised good judgment in believing Brown, but whether his judgment was for an illicit reason. The majority's conclusion in this regard begs the question because if the record indicates that Chief Dotson did not have a basis to believe Brown, then a factual issue is created as to whether he chose to believe Brown based upon an unlawful motive to retaliate against Plaintiff for his protected speech. *See, e.g., Cockrel v. Shelby County Sch. Dist., 270 F.3d 1036, 1055-056 (6th Cir. 2002).* Thus, by concluding that the issue is not whether Chief Dotson exercised good judgment, the majority fails to so much as consider evidence that goes to the very heart of Plaintiff's claim--in contravention of the summary judgment standard requiring that the evidence and all reasonable inferences drawn therefrom be viewed in favor of the nonmoving party. *See Matsushita Elec. Indus., 475 U.S. at 587.* [*36]

Along these lines, evidence that Chief Dotson refused to await the DNA test results that may have proven or disproven Plaintiff's version of the events before proceeding with the hearing that led to Plaintiff's termination, as well as evidence that Plaintiff was misled by being erroneously told that his prior record would not be used in support of his termination, provide further factual bases upon which a jury could conclude that Plaintiff was discharged for engaging in protected speech. The majority's conclusion that evidence of Chief Dotson's refusal to continue or adjourn the matter until such time that the DNA test results could be obtained is of no moment because Plaintiff has not shown that the denial was "unusual," unduly minimizes the potential significance of this evidence and completely misconstrues Plaintiff's burden of proof at the summary judgment stage. That is, in order to survive summary judgment, Plaintiff

need not demonstrate the Chief Dotson's refusal was "unusual," Plaintiff need only demonstrate that a reasonable jury could infer that refusal was for an invidious reason. *See Cockrel, 270 F.3d at 1055* (noting that a plaintiff alleging *First Amendment* [*37] retaliation need only show that the plaintiff's speech, at least in part, motivated the defendants to discharge her). And, indeed, Chief Dotson's refusal to continue or adjourn Plaintiff's hearing to await DNA evidence that could have exonerated Plaintiff, coupled with the fact that Plaintiff had made several complaints of race discrimination just a couple of months prior to the hearing, certainly creates a factual issue as to whether Chief Dotson's decision was motivated by Plaintiff's complaints. *See id.*

In summary, circumstantial evidence of Chief Dotson's decision not to give Plaintiff the benefit of the doubt as he had done for other officers under similar circumstances; his decision to credit Brown's testimony over Plaintiff's claims, despite evidence to indicate that Brown was not being truthful; and his decisions to deny Plaintiff a continuance for the purpose of awaiting test results that could have possibly exonerated Plaintiff and to admit Plaintiff's prior record despite informing Plaintiff otherwise, create factual disputes as to whether these decisions, which were made on the heels of Plaintiff's complaints if race discrimination, were motivated by Plaintiff's [*38] protected speech in violation of his *First Amendment* rights. *See id.* These factual disputes are sufficient to establish a prima facie case even if claims regarding Plaintiff's paycheck are discounted. Thus, having established a prima facie case, the issue of whether Defendants would have discharged Plaintiff in the absence of Plaintiff's protected speech is also a question for the jury to decide, as recognized by the majority. *See Johnson v. Univ. of Cincinnati, 215 F.3d 561, 564 (6th Cir. 2000).*

I would therefore reverse the district court's dismissal of Plaintiff's retaliation claim on summary judgment, and remand the case for trial as to this issue.